UNITED STATES of America, Appellee,

v.

Harry J. WILFORD, Appellant.

UNITED STATES of America, Appellee,

v.

Everett G. DAGUE, Appellant.

UNITED STATES of America, Appellee,

v.

Herman J. CASTEN, Appellant.

UNITED STATES of America, Appellee,

v.

Herman B. BOEDING, Appellant.

Nos. 82–1185 to 82–1188.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1982.

Decided June 22, 1983.

Rehearing and Rehearing En Banc Denied Aug. 1, 1983.

Raymond Rosenberg, Rosenberg & Margulies, Des Moines, Iowa, for appellants Harry J. Wilford, Everett G. Dague, Herman Casten and Herman B. Boeding.

Tom Riley, Cedar Rapids, Iowa, for appellant Herman Casten.

Robert F. Wilson, Cedar Rapids, Iowa, for appellant Herman B. Boeding.

Evan Hultman, U.S. Atty., N.D. Iowa, Cedar Rapids, Iowa, Robert J. Erickson, Atty., Randy Kehrli, Sp. Atty., Dept. of Justice, Washington, D.C., for appellee.

Before LAY, Chief Judge, HENLEY, Senior Judge, and ARNOLD, Circuit Judge.

LAY, Chief Judge.

Harry J. Wilford was convicted of conspiracy to obtain property by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (1976), three misdemeanor offenses of unlawfully demanding or receiving money on behalf of a labor union in violation of the Labor Management Relations Act, 29 U.S.C. § 186(b)(1) (1976), and five misdemeanor offenses of demanding or accepting a fee for the unloading of a vehicle employed in commerce in violation of 29 U.S.C. § 186(b)(2) (1976) and 18 U.S.C. § 2 (1976). Everett G. Dague was convicted of conspiracy in violation of 18 U.S.C. § 1951, four substantive counts of extortion, one count of unlawfully demanding or receiving funds on behalf of a labor union, and three counts

of demanding or accepting an unloading fee. Herman J. Casten was convicted of one count of conspiracy in violation of 18 U.S.C. § 1951, one count of extortion, one count of receiving funds on behalf of a labor union, and two counts of demanding or accepting an unloading fee. Herman B. Boeding was convicted of conspiracy in violation of 18 U.S.C. § 1951, five counts of extortion, three counts of unlawfully receiving funds on behalf of a labor union, and five counts of unlawfully demanding an unloading fee.[1] These appeals followed. We affirm.

*Facts.*

Wilford was the secretary/treasurer and chief executive officer of the Cedar Rapids, Iowa local (Local 238) of the Teamsters Union. Dague and Casten were business agents for the local. Boeding, unlike the other three defendants, was not an officer or an employee of the local; he was, however, a member of Local 238.

The defendants' indictment and convictions stem from their activities at a waste treatment construction site in Cedar Rapids. Darin and Armstrong, Inc. (D & A) was the general contractor at the site, and the defendant Boeding was employed by D & A as a truck driver on the site. Construction began in 1976. Sometime during that year, Boeding began stopping over-the-road trucks coming into the site to deliver materials, and "carding" the driver of each truck—asking him if he belonged to a union. If the driver belonged to a union, he was allowed to drive his truck onto the site and have it unloaded. If the driver indicated that he belonged to no union, Boeding informed him that his truck would not be unloaded by anyone on the construction site[2] unless he joined Local 238. Most drivers, confronted with this choice, agreed to join Local 238 rather than leave the site without having their trucks unloaded. When a non-union driver agreed to join, Boeding would contact Dague or Casten, two of the union's business agents, at the union's offices. Dague or Casten would then come out to the site, fill in the driver's application for membership, request and accept a payment of $49 from the driver (for initiation fee and first month's dues), and provide the driver with a receipt. Later the union would mail the driver a computerized receipt and a membership card. As secretary and treasurer of the union, Wilford endorsed all checks received from the drivers, and signed the membership cards received by each driver.[3]

On some occasions when a non-union driver either refused or was unable to pay the fee to join Local 238, a representative of D & A would pay the fee for the driver, in order to complete the delivery of the driver's materials to the site and avoid delays. At least one driver refused to pay the fee, and left the site without having been unloaded.

The National Labor Relations Board began investigating the situation at the D & A site in April 1978, after a non-union driver filed a complaint with the NLRB about the defendants' activities. Although the NLRB filed suit to enjoin the union's activities, the NLRB and the union eventually entered into a formal settlement stipulation in which the union did not concede that its

---

1. Each defendant was sentenced to three years' probation and fined in an amount between $7,000 and $34,000.

2. A collective bargaining agreement was in force at the D & A site, providing among other things that the construction would be done only by union members. Two of the provisions of the collective bargaining agreement triggered much of the dispute at the construction site, according to the defendants. The first provision, article 11, stated:

    RIGHTS OF UNION MEMBERS
    No member of the Union shall be required to work with a non-union man or men employed on work coming within the scope of

structural building work or operations or on any non-union work coming within the jurisdiction of this Union.
    The second provision, article 19, stated:
    JURISDICTION OF WORK
    All truck driving is the jurisdiction of the Teamsters Union. The parties agree that there shall be a truck driver or drivers on the job at all times that a truck or trucks are on the job.

3. There also was adduced at trial evidence that Wilford was a "strong" union leader, and was aware of the other three defendants' activities at the D & A site.

members had committed any illegal acts, but agreed that its members would stop carding incoming trucks on the D & A site. The union also agreed to refund membership fees to several drivers.[4]

The NLRB then recommended to the Department of Justice that it investigate the conduct of the union officials for violation of criminal statutes. The Department's investigation resulted in a 16-count indictment against the defendants, charging them with conspiracy and substantive violations of the Hobbs Act[5] and with violations of two provisions of the Labor Management Relations Act, 29 U.S.C. § 186(b)(1) and § 186(b)(2).[6]

## I. The Hobbs Act Convictions.

### A. The Substantive Charge.

The defendants argue that their conduct did not come within the definition of "extortion" in the Hobbs Act, 18 U.S.C. § 1951,

---

**4.** The facts of this case evidence a practice similar to the one declared unlawful in *Shepard v. NLRB*, —— U.S. ——, 103 S.Ct. 665, 74 L.Ed.2d 523 (1983). In *Shepard* a Teamsters local in San Diego entered into a master collective bargaining agreement with area contractors and contractors' associations. The agreement provided that only union truck drivers would be allowed to perform hauling services for building contractors in the San Diego area. The NLRB found that the agreement violated 29 U.S.C. § 158(e) (1976), and the court of appeals enforced the board's order. *Building Material and Dump Truck Drivers, Teamsters Local Union No. 36 v. NLRB,* 669 F.2d 759, 765 (D.C.Cir.1981). The Supreme Court affirmed, and held that the NLRB had discretion to decide whether to order reimbursement to drivers who had unwillingly joined the Teamsters in order to work with the contractors who had signed the agreement. 103 S.Ct. at 669.

**5.** The Hobbs Act, 18 U.S.C. § 1951, provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951.

**6.** Section 186 provides in pertinent part:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

(2) It shall be unlawful for any labor organization, or for any person acting as an officer, agent, representative, or employee of such labor organization, to demand or accept from the operator of any motor vehicle (as defined in part II of the Interstate Commerce Act [49 U.S.C. 301 et seq.]) employed in the transportation of property in commerce, or the employer of any such operator, any money or other thing of value payable to such organization or to an officer, agent, representative or employee thereof as a fee or charge for the unloading, or in connection with the unloading, of the cargo of such vehicle: *Provided,* That nothing in this paragraph shall be construed to make unlawful any payment by an employer to any of his employees as compensation for their services as employees.

29 U.S.C. § 186.

and therefore that the trial court erred in denying the defendants' motion for acquittal of all Hobbs Act charges.[7]

In *United States v. Enmons,* 410 U.S. 396, 400–01, 93 S.Ct. 1007, 1009–10, 35 L.Ed.2d 379 (1973), the Supreme Court held that "wrongful," as that term is used in section 1951(b)(2) to define "extortion," has meaning in the Hobbs Act "only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." 410 U.S. at 400, 93 S.Ct. at 1009.[8] The Court concluded that the use of violence during the course of a lawful strike for higher wages was not prohibited by the Hobbs Act.

■ The defendants in this case argue that they were pursuing two legitimate labor objectives: (1) the defendants were enforcing their rights under the collective bargaining agreement in force at the D & A site, which stated that "[a]ll truck driving is the jurisdiction of the Teamsters Union"; and (2) the defendants were soliciting membership in the Teamsters Union and organizing those members. Because these were their objectives, and because these are "legitimate labor objectives," the defendants argue, they may not be prosecuted under the Hobbs Act, because their use of actual or threatened force, violence, or fear was not "wrongful."[9] The government counters on appeal that the defendants' actions "constituted an attempt to bolster Local 238's treasury by wrongfully taking money from transient truckers under the guise of obtaining 'union dues.'"

■ We need not decide whether the defendants' asserted objectives are "legitimate labor objectives." The evidence is sufficient to support the jury's conclusion that the defendants had no lawful claim to the money they received from the non-union drivers. In spite of the defendants' assertions as to what the objectives of their conduct were, there is evidence to support the jury's conclusion that these were not the defendants' true objectives. The jury expressly found all four defendants guilty of demanding and accepting an unloading fee in violation of 29 U.S.C. § 186(b)(2). Even though the defendants claim that one of their legitimate labor objectives was to solicit and organize members of the Teamsters Union, evidence showed that at least one new "member" was told that he would receive no union benefits in return for his payment except the opportunity to have his truck unloaded in the Cedar Rapids area. In addition, some of the non-union drivers were self-employed, and thus were persons for whom the union could provide no real membership benefits, at least not in the areas of standardization of wages and the representation of those drivers in a collective bargaining situation.[10]

The defendants also claim that by their actions they were attempting to enforce the

---

7. The Hobbs Act was Congress' response to the Supreme Court's decision in *United States v. Local 807, International Brotherhood of Teamsters,* 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942). The genesis of the Act is outlined in *United States v. Enmons,* 410 U.S. 396, 401–03, 93 S.Ct. 1007, 1010–11, 35 L.Ed.2d 379 (1973).

8. In *United States v. Quinn,* 514 F.2d 1250 (5th Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976), the court noted:

   [T]he effect of *Enmons* was to remove from the reach of federal criminal law the use of coercive tactics to obtain increased wages, but with the caveat that the prosecutor's hand would be stayed *only* when the payment is gained in furtherance of legitimate labor objectives.

   *Id.* at 1257 (footnote omitted) (emphasis in original).

9. It is well settled that the requisite "fear" under the Hobbs Act may be fear of economic loss. *E.g., United States v. Rabbitt,* 583 F.2d 1014, 1027 (8th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *United States v. Quinn,* 514 F.2d at 1256. Several of the drivers who were required to join Local 238 testified that they or their employers would suffer economic loss if they were forced to take their cargo, unloaded, back to its point of origin or any place other than its slated destination, the D & A site.

10. To force a self-employed person to join a labor union is unlawful under 29 U.S.C. § 158(b)(4)(ii)(A) (1976).

   In *United States v. Quinn,* 514 F.2d at 1259, the Fifth Circuit held that the fact that the

provisions of the collective bargaining agreement in force at the D & A site. Two of those provisions stated in essence that no member of a union would be required to work with a non-union person, and that all truck driving would be the jurisdiction of the Teamsters Union. But the defendants' asserted objective is belied by the fact that non-union drivers were not allowed by the defendant Boeding to trade their loads with a union driver, and by the fact that the new "members" were not allowed to drive the trucks of other non-union drivers onto the site.

Thus, the jury reasonably could have concluded that among the defendants' objectives were to force non-union drivers to pay an unloading fee, and to force *all* non-union drivers, even self-employed drivers, to join, not just any Teamsters Union local, but Local 238 in Cedar Rapids, Iowa, regardless of whether the drivers' home or usual route of travel included Cedar Rapids. This constitutes a pattern of obtaining money through the use of fear, money to which the defendants had no lawful claim. We therefore conclude that the jury reasonably could find, and did find, that the defendants were guilty of extortion under the Hobbs Act because they obstructed, delayed, or affected commerce or the movement of an article or commodity in commerce by using fear of economic loss to obtain property to which they had no lawful claim.[11]

B. The Due Process Claim—duplicative prosecution of misdemeanors under 29 U.S.C. § 186(b)(2).

The defendants also argue that if their acts constitute extortion under the Hobbs Act, this results in a violation of their rights to due process, because, the defendants charge, the same factual nucleus that supports several of the Hobbs Act extortion charges also supports several of the misdemeanor charges.[12] The defendants urge that there must be a clear difference between conduct that supports a charge of a misdemeanor violation and conduct that supports a charge of an aggravated felony. In this case, the defendants contend, the same conduct is used in the indictment to support both the felony and misdemeanor counts.

■ The double jeopardy clause of the fifth amendment protects an accused against multiple punishments for the same offense. *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977); *United States v. Anderson,* 654 F.2d 1264, 1268–69 (8th Cir.), *cert. denied,* 454 U.S. 1127, 102 S.Ct. 978, 71 L.Ed.2d 115 (1981). In *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court held that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. at 182. In this case we must decide whether the defendants' acts on three different occasions each constituted a felony under the Hobbs Act and a misdemeanor, or whether only one offense arose from each incident.

■ In applying the *Blockburger* test to the facts of this case, we note that a viola-

---

defendant received money in violation of federal law made it clear that he had no lawful claim to the payment; "its receipt," the court concluded, "was statutorily declared not to be a legitimate labor objective." *Id.*

11. In *United States v. Porcaro,* 648 F.2d 753, 759–60 (1st Cir.1981), the defendant argued that he was acting pursuant to his company's "inherent right" to enforce the terms of a management agreement between his company and the victims of the extortion. The defendant contended that because he was pursuing a legitimate end, the Supreme Court's ruling in *Enmons* protected him from prosecution under the Hobbs Act. The court of appeals disa-

greed, holding that the evidence showed that the defendant through his acts of extortion was not pursuing his stated objective.

12. Specifically, count five of the indictment (extortion under the Hobbs Act) stems from the same incident as count 11 (demanding and accepting an unloading fee, a misdemeanor in violation of 29 U.S.C. § 186(b)(2)); count six (same Hobbs Act charge) stems from the same incident as count 13 (same misdemeanor charge); and count three (same Hobbs Act charge) stems from the same incident as count 14 (same misdemeanor charge).

tion of the Hobbs Act requires proof of extortion or robbery and an effect upon commerce, but a violation of the Labor Management Relations Act, 29 U.S.C. § 186, does not. A violation of 29 U.S.C. § 186(b)(2) requires that the accused be a labor organization, or a person acting as an officer, agent, representative, or employee of a labor organization; the Hobbs Act, on the other hand, applies to "whoever" violates its provisions. Section 186(b)(2) of the Labor Act requires that the payment be a fee or charge for the unloading, or in connection with the unloading, of the cargo of a motor vehicle employed in the transportation of property in commerce; the Hobbs Act has no such requirement. Therefore, it is plain that a violation of the Hobbs Act can take place that is not at the same time a violation of the Labor Management Relations Act, and vice-versa.

In *Brown v. Ohio,* the defendant had been convicted of auto theft and joyriding, and both convictions stemmed from the same incident. In holding that the double jeopardy clause would be violated if the defendant were punished for both offenses, the Supreme Court noted: "The prosecutor who has established joyriding need only prove the requisite intent [permanently to deprive the auto's owner of possession] in order to establish auto theft; the prosecutor who has established auto theft necessarily has established joyriding as well." 432 U.S. at

167–68, 97 S.Ct. at 2226. The same cannot be said in this case. As noted above, the Hobbs Act and the Labor Act each require different elements for a violation to be established. A prosecutor who establishes a Hobbs Act violation has not necessarily established a violation of the Labor Act, and a showing sufficient to support a Labor Act violation does not necessarily prove a violation of the Hobbs Act. We therefore conclude that the felony and misdemeanor charges in this case are not inconsistent, and that the defendants have suffered no double jeopardy or violation of due process.[13]

## II. The NLRB's Referral of the Case to the Department of Justice.

Before opening statements were given by the attorneys, the prosecutor informed the trial court that an NLRB official would testify that, upon the conclusion of the NLRB's investigation of Local 238's activities at the D & A site, the NLRB requested that the Department of Justice begin criminal investigation into the conduct of some of the union agents in the D & A matter. Defense counsel objected that evidence of the referral was immaterial, and would create an impermissible inference of guilt, since the jury would interpret the referral to mean that the NLRB felt that the defendants were guilty of criminal

---

**13.** *See United States v. Kramer,* 355 F.2d 891, 895–96 (7th Cir.), *cert. denied,* 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396 (1966), in which the court held that charges under the Hobbs Act and 29 U.S.C. § 186(b)(1) were not inconsistent.

In *Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the Supreme Court made it clear that *Blockburger* is a rule of statutory construction, and not a constitutional absolute. The Court held: "[S]imply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes." *Id.* 103 S.Ct. at 679.

The Court noted that in *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), it had held that the *Blockburger* test is a rule of statutory construction, and prohibits cumulative punishments under two

statutory provisions proscribing the same offense in the absence of a clear indication of contrary legislative intent. 445 U.S. at 691–92, 100 S.Ct. at 1437–38.

The Court in *Hunter* concluded that when [a] legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger,* a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

103 S.Ct. at 679.

Since we find in this case that the two statutes in issue do not proscribe the same offense, we need not reach the issue presented to the Supreme Court in *Hunter, i.e.,* whether the legislature intended to impose cumulative punishments for the same offense.

behavior. The trial court concluded that evidence of the referral was simply background information as to how the government began criminal proceedings in the case, and ruled that the prosecution could present evidence of the referral itself, as long as there would be no evidence as to why the NLRB referred the case to the Department of Justice. Thereafter, in opening statement, the prosecutor told the jury that "the NLRB witnesses will testify that there was a civil action against the union in this case and that the case was then referred to the Department of Justice regarding the union agents as opposed to the union." An NLRB attorney testified that at the conclusion of the NLRB's civil action against Local 238, "[t]he NLRB contacted the Department of Justice and requested that [it] begin investigating Teamster Local 238 for violation of certain criminal statutes."

The defendants argue on appeal that the trial judge erred in admitting evidence of the referral of the case to the Department of Justice, because the evidence created an impermissible inference that the defendants were guilty.

In *Weaver v. United States,* 379 F.2d 799, 802–03 (8th Cir.), *cert. denied,* 389 U.S. 962, 88 S.Ct. 347, 19 L.Ed.2d 374 (1967), the prosecutor told the jury that a "grand jury, ... selected from the same group of people that you were selected from, sat and heard the Government's evidence in the case and then determined that there was probable cause to make a charge." *Id.* at 802. The trial court immediately ruled that the statement was improper, and warned the jury that the fact that an indictment has been returned against a defendant "is absolutely no evidence of the guilt of the defendant...." *Id.* This court affirmed the conviction and held that any error caused by the prosecutor's remarks was rendered harmless by the trial court's instructions.[14]

The defendants in this case argue that the same impermissible inference of guilt the prosecutor attempted to create in *Weaver* was in fact created in this case, and the trial court in this case did not instruct the jurors that they were not to infer the defendant's guilt from the fact that the NLRB referred the case to the Department of Justice.

Even if we were to agree that the statement in this case created as strong an impermissible inference of guilt as the statements in the cases discussed above, when we consider the overall evidence of the defendants' guilt we do not find that the trial court committed a clear and prejudicial abuse of discretion in admitting the statements. *See Auto-Owners Insurance Co. v. Jensen,* 667 F.2d 714, 722 (8th Cir.1981); *United States v. Williams,* 545 F.2d 47, 50 (8th Cir.1976). The referral was mentioned only once by the prosecutor, and was mentioned once briefly by the NLRB attorney who testified. When we compare this to the evidence supporting the defendants' convictions, we find that any "error did not influence the jury, or had but very slight effect," *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946). We therefore decline to reverse the district court on this ground.

---

**14.** In *Gordon v. United States,* 384 F.2d 598, 600–01 (8th Cir.1967), a substantial number of the petit jurors in the defendant's case were present while a grand jury was being impaneled and instructed, apparently in an unrelated case. The court instructed the grand jury that it must not return an indictment unless it was convinced the accused was guilty. Gordon, who had been indicted, argued that the instructions to the grand jury, heard by the petit jurors in his case, allowed the petit jurors impermissibly to infer his guilt from the fact that he had been indicted. This court declined to find reversible error, and held that the instructions as a whole to the grand jury were proper, and that the trial court's limiting instructions to the petit jurors, that an indictment may not create an inference of guilt, eliminated any possible prejudice to Gordon's case. *See also Brandom v. United States,* 431 F.2d 1391, 1397 (7th Cir.1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971); *United States v. Lewis,* 423 F.2d 457, 459–60 (8th Cir.), *cert. denied,* 400 U.S. 905, 91 S.Ct. 146, 27 L.Ed.2d 142 (1970).

### III. Evidence of Wilford's Character.

■ The defendants claim that the trial court erred in admitting character evidence of the defendant Wilford.[15]

The defendants placed the character of Wilford in issue by presenting evidence of his good character; the fundamental question is whether the prosecution exceeded the proper scope of rebuttal. We have examined this issue and find no abuse of discretion by the trial judge.

### IV. Sufficiency of the Evidence to Support Wilford's and Dague's Convictions.

Wilford argues that the evidence adduced at trial was not sufficient to support his conviction for conspiracy to obtain property by extortion in violation of the Hobbs Act or his eight convictions for violation of the Labor Management Relations Act.[16] Dague challenges the sufficiency of the evidence to sustain his conviction on count 16, which charged him with aiding and abetting a violation of 29 U.S.C. § 186(b)(2) and (d). Wilford and Dague argue that the trial court erred in denying their motions for acquittal of the above-mentioned counts. We disagree, and find no error by the trial court.

■ To be guilty of conspiracy, one need knowingly contribute his efforts to the furtherance of the conspiracy. *United States v. Fanello,* 662 F.2d 505, 509 (8th Cir.1981); *United States v. Kenny,* 462 F.2d 1205, 1223, 1226 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). Conviction on a charge of aiding and abet-

ting under 18 U.S.C. § 2 requires that the government show that the defendant willfully associated himself in some way with the criminal venture and willfully participated in it as he would in something he wished to bring about. *United States v. Indelicato,* 611 F.2d 376, 385 (1st Cir.1979); *United States v. Crow Dog,* 532 F.2d 1182, 1195 (8th Cir.1976), *cert. denied,* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977); *United States v. Wiebold,* 507 F.2d 932, 934 (8th Cir.1974). The evidence adduced at trial, when viewed in the light most favorable to the verdict, showed that Wilford knew of the activities of the other three defendants at the D & A site, that the other three were operating with Wilford's approval, and that Wilford endorsed the checks and signed the membership cards of the new "members." Similarly, evidence showed that Dague, as business agent for Local 238, threatened to strike the D & A construction site if non-union trucks were unloaded there, rejected D & A officials' complaints about the activities of Local 238 on the site, and directed the activities of the defendant Boeding on the site. We find this evidence sufficient to sustain Wilford's and Dague's convictions. The fact that the defendants controverted this evidence does not negate its sufficiency; it only created a conflict in the evidence for the jury to resolve.

### V. Evidence of Prior Similar Acts.

■ The defendants argue that the trial court erred in admitting evidence of (1) a charge, filed with the NLRB and subsequently withdrawn, relating to an incident

---

**15.** Rule 404 of the Federal Rules of Evidence, which governs the admission of character evidence, states in pertinent part:

(a) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same. . . .

Fed.R.Evid. 404(a)(1).

**16.** See 18 U.S.C. § 2, which provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, com-

mands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

*Id.* Wilford was convicted of count seven, which charged him with requesting, demanding, receiving or accepting money paid by D & A to Local 238, in violation of 29 U.S.C. § 186(b)(1) & (d) and 18 U.S.C. § 2. Wilford was also convicted of counts nine through 14 and count 16, which charged him with aiding and abetting the other defendants' violations of 29 U.S.C. § 186(b)(1) & (2).

that took place in February 1976 at the Corn Sweeteners plant in southwest Cedar Rapids, and (2) a labor dispute and subsequent NLRB adjudication relating to an incident in September 1975 at the Pittsburgh-Des Moines Steel Company construction site in Cedar Rapids. The prosecution offered the evidence to show the defendants' intent in the D & A incident.[17] The district court instructed the jurors, when the evidence was admitted and at the close of the case, that they were to consider evidence of the other incidents only on the question of the defendants' intent.[18]

By arguing that they were pursuing legitimate labor objectives (*i.e.,* enforcement of the collective bargaining agreement and the solicitation and organization of new members), the defendants have raised as a material issue their intent in committing these acts. The government sought to introduce evidence of the prior similar acts to show that the defendants were aware that their acts were unlawful, and that their intent was to commit such unlawful acts. Given the similarity of the prior acts to the acts at issue in this case,[19] we find that the evidence of the other acts was relevant to the issue of the defendants' intent.

The defendants argue that the acts relating to the Corn Sweeteners incident were not proven by clear and convincing evidence, since the exhibit to which defend-

ants object regarding this incident was only a charge filed with the NLRB, and was withdrawn before any resolution was reached or any adjudication was made. However, in addition to offering the charge as an exhibit, the government introduced testimony of a vice-president of the general contractor at the Corn Sweeteners plant. The vice-president testified that he was familiar with the circumstances surrounding the charge, that an in-coming truck driven by a non-union driver was stopped and the driver was carded by the defendant Dague, and that the driver was not permitted to unload until two or three days later, when the NLRB began an investigation of the incident. Admission of the charge as an exhibit must be viewed together with the corroborating testimony of the witness to the event; when these two items of evidence are viewed together, it becomes apparent that the incident at the Corn Sweeteners plant was established by clear and convincing evidence. *See United States v. O'Brien,* 618 F.2d 1234, 1239 (7th Cir.), *cert. denied,* 449 U.S. 858, 101 S.Ct. 157, 66 L.Ed.2d 73 (1980) (testimony of participant in both prior incident and incident at issue established existence of prior incident by clear and convincing evidence).[20]

In light of our discussion regarding the similarity of the prior acts to the acts in issue here, we find the other acts to be sufficiently "similar in kind and reasonably

17. Intent is an essential element of a violation of the Hobbs Act. *See United States v. Adcock,* 558 F.2d 397, 402 (8th Cir.), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

18. Federal Rule of Evidence 404(b) states:
   (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
   Fed.R.Evid. 404(b).

19. The two prior acts and the acts at issue in this case all involved members of Local 238, including the defendant Dague, who carded the drivers of in-coming trucks and then refused to

allow non-union drivers to have their trucks unloaded unless they first joined Local 238. The Corn Sweeteners incident took place in Cedar Rapids in February 1976, the Pittsburgh-Des Moines Steel incident took place in Cedar Rapids in September 1975, and the incidents at issue in this case took place in Cedar Rapids from October 1976 to October 1978.

20. *Cf. United States v. Beechum,* 582 F.2d 898 (5th Cir.1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979):
   The standard for the admissibility of extrinsic offense evidence is that of [Fed.R.Evid.] 104(b): "the preliminary fact can be decided by the judge against the proponent only where the jury could not reasonably find the preliminary fact to exist."
   582 F.2d at 913.

close in time to the charge at trial" to be admissible. *See United States v. Two Eagle,* 633 F.2d 93, 96 (8th Cir.1980). We find no error in the trial court's admission of evidence of prior acts.

VI. *Local 238's Settlement Agreement with the NLRB.*

█ Before criminal charges were filed by the Department of Justice, the NLRB began an investigation into the activities of Local 238 at the D & A construction site. The investigation ended when the NLRB and Local 238 entered into a formal settlement stipulation, whereby Local 238 agreed to cease its disputed activities at the D & A site, and refund the fees paid by certain non-union drivers. Local 238 expressly noted in the stipulation that it was not admitting that it had violated the National Labor Relations Act.

At trial the government offered into evidence two exhibits containing the settlement agreement, and the testimony of an NLRB attorney concerning the circumstances surrounding the agreement. The trial court admitted the evidence over the defendants' objections.

The defendants argue on appeal that evidence of the settlement stipulation was irrelevant and immaterial, since the defendants were not parties to the agreement, and therefore should not have been admitted. Defendants also contend that evidence of the settlement stipulation was inadmissible under Fed.R.Evid. 408.[21] The government counters that the defendants, on cross-examination of drivers who had received the refunds, placed in issue the circumstances surrounding the refunds, and therefore the government was entitled to introduce evidence of the settlement stipulation to explain fully the circumstances in which Local 238 made the refunds.[22]

To determine whether the trial court properly admitted evidence of the settlement stipulation, we must decide first, whether the evidence was relevant to an issue in the lawsuit, and second, whether rule 408 prohibited admission of the evidence.

During the trial, on direct examination, the government asked driver J.W. Coon whether the money he used to pay Local 238's fee came from his own pocket or whether he was reimbursed for it. Coon responded that he was not "reimbursed" until some time later, when Local 238 mailed him a check refunding the fee he had paid at the D & A site.

The prosecutor asked another driver, Charles Boyd, whether he had received anything from Local 238 after he had paid the fee and had left the D & A site. Boyd responded that he was uncertain whether he had received a newsletter or anything similar, but Local 238 had sent him a refund of the fees he had paid. The prosecutor followed this response with a question as to whether Boyd had ever received anything else from Local 238, and whether he wanted to be a member of Local 238. On cross-examination, defense counsel asked Boyd whether he had sent the refund to the trucking company that had paid the fee. Boyd responded that when he received the

21. That rule provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. Fed.R.Evid. 408.

22. The government also argues on appeal that the defendants did not object on the ground that admission of the evidence would violate rule 408, and therefore the issue is not preserved for appeal. *See* Fed.R.Evid. 103(a)(1). Because we find that the evidence was admissible even assuming the defendants properly objected, we need not reach this issue.

refund he was no longer associated with the trucking company that paid the fee, so he kept the refund.

On the direct examination of Charles Higgs, another driver, the prosecutor asked him if he knew why he received a refund from the union, and if he knew from whom he had received the refund. Higgs answered "no" to both questions. On cross-examination, defense counsel showed Higgs a copy of the refund check, whereupon Higgs stated that he received the refund from the defendant Wilford, and from Local 238.

Subsequent to this testimony, the prosecutor sought to introduce evidence of the settlement stipulation "to explain the situation involving those [refunds], why the [refunds] were made, who they went to, the amount, and generally [to] explain to the jury under what circumstances [these refunds were] made to these truck drivers...."

Because the defense counsel placed the refunds in issue, the government was entitled to explain to the jury the circumstances surrounding the refunds. The prosecutor's questions on direct examination to drivers Coon and Boyd were not intended to examine whether and why the drivers had received refunds; the prosecutor inquired of Coon whether he had been *reimbursed* for the fee he had paid, and inquired of Boyd whether he had received any materials or benefits from Local 238, and whether he wanted to be a member of Local 238. When defense counsel on cross-examination inquired of the drivers whether they had kept the refunds themselves, and elicited a response from Higgs that the refund had come from Local 238 and the defendant Wilford, he placed in issue the matter of under what circumstances the refunds were made. As a result, the government was entitled to show that the refunds in fact stemmed from an agreement by Local 238 with the NLRB. Thus, we conclude the evidence of the settlement stipulation was relevant to an issue in the lawsuit.

We also find that rule 408 does not bar admission of the evidence. That rule provides that evidence of compromise or offers to compromise "is not admissible to prove liability for or invalidity of the claim or its amount." The rule expressly states that it "does not require exclusion when the evidence is offered for another purpose...." Fed.R.Evid. 408. In this case evidence of the settlement stipulation was offered to explain the circumstances surrounding the refunds, not to show that Local 238 violated the National Labor Relations Act. The defendants were further protected from any inference of guilt by the provision in the stipulation which stated that Local 238 did not admit to any violation by entering into the stipulation.

We therefore conclude that the trial court properly admitted evidence of the settlement stipulation.

VII. *Denial of the Defendants' Request for Surrebuttal.*

The defendants argue that a witness presented by the government during its rebuttal brought forward new facts not raised earlier, and that the defendants were entitled to present evidence on surrebuttal to counter the witness' testimony and to impeach his credibility. The trial court sustained the government's objection to surrebuttal by the defendants.

The witness, an investigator for the NLRB, testified as to his observation of events taking place at the Pittsburgh-Des Moines Steel Co. site (discussed in section V *supra*). The government's stated purpose in offering the investigator's testimony was to show the similarity of the Pittsburgh-Des Moines incident to the incident for which the defendants were being tried. The defendants argue that they were entitled to present evidence in surrebuttal because the witness intimated that a violent act took place in connection with the stopping of a truck driven by a non-union driver,[23] and

---

23. The investigator testified that he was standing next to two members of the iron workers union when a non-union driver approached the

site in his truck. According to the investigator, one iron worker said to the other, "Do you want to take him or should I?" The other

because the defendants were entitled to show the investigator's bias against the Teamsters Union.

 The decision whether to allow a party to present evidence in surrebuttal is committed to the sound discretion of the trial court. *United States v. Burgess,* 691 F.2d 1146, 1153 (4th Cir.1982); *Kines v. Butterworth,* 669 F.2d 6, 13 (1st Cir.1981), *cert. denied,* 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982); *United States v. Greene,* 497 F.2d 1068, 1083 (7th Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). In this case we find no abuse of discretion by the trial judge in his refusal to allow the defendants' surrebuttal. The defendants' argument that the investigator's testimony "raised the most serious suggestion of force or violence in connection with any labor dispute during the trial" exaggerates the impact of the investigator's testimony. In addition, even though a party is normally entitled to impeach the credibility of an opponent's key witness, *see Kines v. Butterworth,* 669 F.2d at 13, in this case the investigator was not a key government witness, and in light of other evidence adduced at trial, his testimony regarding the similarity of the Pittsburgh-Des Moines incident to the incident for which the defendants were being tried was merely cumulative. Thus, it was not unfairly prejudicial for the trial court to refuse to allow the defendants to present evidence in surrebuttal. As the Seventh Circuit noted in *United States v. Greene:*

> When the point of completion of a trial has been reached, which was the situation here, the trial judge should be vested with substantial discretionary powers to bring the evidentiary phase to a close, or to put it another way, to curb the natural tendency of vigorous counsel to get in the final word.

497 F.2d at 1083. We find no prejudicial error in the trial court's ruling.

*Conclusion.*

Because we find no prejudicial error in the contested rulings of the trial judge, the defendants' convictions are affirmed.

---

replied, "Let me have him," crushed his paper cup and threw it on the ground, and started walking toward the truck to card the driver. The investigator testified that he feared that some form of violence might erupt between the driver and the iron workers, so he walked over to talk to the iron worker who was carding the truck. No violence of any sort did occur.