# SHEPARD *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 81–1627.   Argued December 6, 1982—Decided January 18, 1983

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined.   O'CONNOR, J., filed a dissenting opinion, *post*, p. 352.

*Robert F. Gore* argued the cause for petitioner. With him on the brief was *Rex H. Reed*.

*Edwin S. Kneedler* argued the cause for respondent National Labor Relations Board. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Wallace, Norton J. Come,* and *Linda Sher*. *Richard D. Prochazka* filed a brief for respondent Building Material and Dump Truck Drivers, Teamsters Local 36. *Robert W. Bell, Jr.,* filed a brief for respondents Associated General Contractors of America et al. *William C. Bottger, Jr.,* and *Robert Varde Kuenzel* filed briefs for respondent California Dump Truck Owners Association.*

JUSTICE REHNQUIST delivered the opinion of the Court.

This case grows out of a labor dispute in the construction industry in San Diego County, Cal. The issue is whether the National Labor Relations Board was required to provide a make-whole remedy for a violation of § 8(e) of the National Labor Relations Act (Act), 73 Stat. 543, 29 U. S. C. § 158(e), which prohibits so-called "hot cargo" contracts.[1]

Petitioner Larry Shepard owns a dump truck, and operates it in the San Diego area to haul materials to and from construction sites. Contractors in this area generally hire dump truck operators through so called "brokers" on a day-to-day basis. Brokers agree with contractors to supply trucks and operators, then refer hauling jobs to individual owner-oper-

---

*\*J. Albert Woll, Laurence Gold, Michael H. Gottesman,* and *Jeremiah A. Collins* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

[1] Section 8(e) provides in pertinent part:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement . . . whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any employer, or to cease doing business with any other person, and any contract or agreement entered into . . . containing such an agreement shall be to such extent unenforcible *[sic]* and void . . . ." 73 Stat. 543.

ators such as Shepard. Brokers handle the owner-operators' billing and perform other coordinating services. They receive commissions based on the amount billed.

Before August 1978, Shepard was not a member of any union. In 1977 respondent Building Material and Dump Truck Drivers, Teamsters Local 36 (Union), entered into a new master collective-bargaining agreement (Agreement) with respondent contractors' associations and their member contractors (Contractors). This Agreement accomplished a long-sought objective of the Union by prohibiting dealings on the part of contractors with nonunion operators. The effect of the Agreement was described by the Court of Appeals in this language:

> "[T]he Union enlisted the aid of the Contractors to insure that only signatory brokers received subcontracts and only union truck operators performed hauling services for building contractors in the San Diego area." 215 U. S. App. D. C. 373, 376, 669 F. 2d 759, 762 (1981).

In February 1978, Shepard contracted with Terra Trucking Co., a broker that had subscribed to the Agreement, for brokerage services. Although Shepard was not a member of the Union, he authorized Terra to make deductions from his earnings for several purposes, including the fringe benefit plan created by the Agreement. Terra deducted the appropriate sums when Shepard worked on union jobs and paid them to the Union's fringe benefit funds.

In August 1978, the Union wrote to Terra stating that under the Agreement Terra must not deal with seven nonunion owner-operators, including Shepard. Terra informed these owner-operators that they would have to join the Union or find a new broker. Shepard joined under protest and paid an initiation fee and dues.

Shepard and respondent California Dump Truck Owners Association (Association) filed charges with the National Labor Relations Board, claiming that the Agreement vio-

lated both § 8(e) and § 8(b)(4) of the Act,[2] 29 U. S. C. § 158(b)(4), the latter of which prohibits secondary boycotts. At the request of the Regional Director of the Board, Shepard filed a new charge alleging only a violation of § 8(e). In 1979 the Regional Director consolidated the two charges and issued a complaint against the Union and the Contractors alleging only a violation of § 8(e). After a hearing, an Administrative Law Judge found that these owner-operators are independent contractors rather than employees, and that the Union and the Contractors had therefore violated § 8(e) by agreeing not to do business with nonunion owner-operators. The ALJ recommended that the Board issue a cease-and-desist order and order the Union and the Contractors to reimburse owner-operators who were compelled to join the Union for amounts paid as dues, initiation fees, and fringe benefit contributions.

The Board affirmed the ALJ's findings and adopted his recommended order except for the reimbursement provision. The Board stated:

---

[2] Section 8(b)(4), as set forth in 29 U. S. C. § 158(b)(4), provides in pertinent part:

"It shall be an unfair labor practice for a labor organization or its agents—

.        .        .        .

"(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(A) forcing or requiring any employer or selfemployed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . ."

"The Board has on one occasion adopted without comment an [ALJ's] recommended order containing such a remedy. *Local 814, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Santini Brothers, Inc.)*, 208 NLRB 184, 201 (1974). In the present case, however, there is insufficient evidence in the record with respect to alleged losses directly attributable to actual coercion by Respondents. Furthermore, we find a reimbursement order, typically used to 'make whole' *employees* for violations of the Act, to be generally overbroad and inappropriate in the context of 8(e) violations. We note that aggrieved owner-operators engaged in business as independent contractors may pursue a damage claim under Sec. 303 of the Act. For the foregoing reasons, we find that the reimbursement of owner-operators ordered by the [ALJ] would not effectuate the remedial policies of the Act. See *[Carpenters]* v. *N. L. R. B.*, 365 U. S. 651 (1961)." 249 N. L. R. B. 386, n. 2 (1980) (emphasis in original).

On petitions for review, the Court of Appeals enforced the Board's order in all respects. It held that "the Board's explanation is adequate, and that given our limited authority to disturb the Board's exercise of discretion in such matters we may not interfere." 215 U. S. App. D. C., at 380, 669 F. 2d, at 766. In a similar case involving dump truck owner-operators and a similar collective-bargaining agreement, the Court of Appeals for the Ninth Circuit remanded the case to the Board to order reimbursement, or to explain why reimbursement would not effectuate the purposes of the Act. *Joint Council of Teamsters No. 42* v. *NLRB*, 671 F. 2d 305, 310–313 (1981). We granted certiorari in this case, 456 U. S. 970 (1982), and now affirm the judgment of the Court of Appeals for the District of Columbia Circuit.

The Board's authority to issue an order in this case is granted by § 10(c) of the Act, 49 Stat. 454, as amended, 29 U. S. C. § 160(c):

> "If . . . the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board . . . shall issue . . . an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act."

Shepard and the Association argue that the Board is *required* to order a make-whole remedy in this case. They rely on the reasoning of the Ninth Circuit in *Joint Council of Teamsters No. 42, supra,* that "where money has been collected illegally, the Board should order a refund, absent some rational ground for not doing so." 671 F. 2d, at 310. We think the Court of Appeals for the Ninth Circuit took too restricted a view of the Board's discretion in designing a remedy. We conclude that the Board need not order reimbursement because its conclusion that the policies of the Act would not be effectuated by such an order is reasonable.

Congress has delegated to the Board the power to determine when the policies of the Act would be effectuated by a particular remedy. "In fashioning its remedies . . . the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 612, n. 32 (1969). See *Fibreboard Paper Products Corp.* v. *NLRB,* 379 U. S. 203, 216 (1964). In this case, the Board issued a cease-and-desist order and an order requiring the Union and the Contractors to post notices stating that the illegal portions of the Agreement will not be enforced. Shepard insists that the Board should have gone the last mile and ordered reimbursement as well.

The Board justified its action in declining to grant this additional remedy by the portion of its order quoted above. This explanatory paragraph strikes us as something less than a model of precise expository prose. Shortly after the enactment of the National Labor Relations Act, this Court had occasion to remind the Board:

> "The administrative process will best be vindicated by clarity in its exercise. Since Congress has defined the authority of the Board and the procedure by which it must be asserted and has charged the federal courts with the duty of reviewing the Board's orders (§ 10(e) and (f)), it will avoid needless litigation and make for effective and expeditious enforcement of the Board's order to require the Board to disclose the basis of its order. We do not intend to enter the province that belongs to the Board, nor do we do so. All we ask of the Board is to give clear indication that it has exercised the discretion with which Congress has empowered it." *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 197 (1941).

In this case, we think that the sense of the Board's explanation is that it has decided to treat cases in which there is no finding of "actual" coercion differently from cases in which there is such a finding. By actual coercion, the Board apparently means threats, picketing, a strike, or some other form of coercion that would amount to a violation of § 8(b)(4). See *Teamsters* v. *Morton*, 377 U. S. 252, 259 (1964). It can scarcely be doubted that the Board could properly conclude that a remedy such as reimbursement should be reserved for especially egregious situations.

In choosing to accord the limited relief that it did, the Board relied on *Carpenters* v. *NLRB*, 365 U. S. 651 (1961), in which this Court held that a showing of coercion was required before the Board could order a union to reimburse dues paid to it by workers who were required by an unlawful "closed shop" contract to join the union. The Board presumably concluded that the reasoning of this case supported, at least

by analogy, its decision not to award reimbursement. We think this conclusion was justifiable.

Congress has provided a judicial damages remedy for illegal secondary activity in § 303 of the Labor Management Relations Act of 1947,[3] 29 U. S. C. § 187. Shepard and the Board agree that § 303 provides a remedy only for violations of § 8(b)(4) of the Act, which, in turn, requires proof of coercion. Brief for Petitioner 28–37; Brief for Respondent National Labor Relations Board 32, n. 19, 38–42. Of course, Congress is free to provide a damages remedy for some violations of federal law, and not for others. It is reasonable for the Board to follow the pattern of the Act and order reimbursement only where Congress chose to permit damages.

The crux of the argument against the Board's position made by Shepard and the Association is that actual coercion is not an element of a § 8(e) violation and therefore should not be required as a prerequisite to what they call "complete relief." Brief for Petitioner 17. But the very way in which this argument is framed suggests that its proponents misconceive the role of the Board. The Board is not a court; it is not even a labor court; it is an administrative agency charged by Congress with the enforcement and administration of the federal labor laws. While a prayer for "complete relief" might find a receptive ear in a court of general jurisdiction, it is well settled that there are wide differences between administrative agencies and courts. See, *e. g., FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 141–144 (1940). This

---

[3] Section 303 provides in pertinent part:

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 8(b)(4) . . . .

"(b) Whoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States . . . without respect to the amount in controversy, or in any other court, and shall recover the damages by him sustained and the cost of the suit." 61 Stat. 158, as amended, 73 Stat. 545.

Court has said that the Board's "power to order affirmative relief under § 10(c) is merely incidental to the primary purpose of Congress to stop and to prevent unfair labor practices. Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct." *Automobile Workers v. Russell*, 356 U. S. 634, 642–643 (1958).

We find nothing in the language or structure of the Act that requires the Board to reflexively order that which a complaining party may regard as "complete relief" for every unfair labor practice. We are satisfied for the reasons heretofore stated that the Board acted within its authority in deciding that a reimbursement order in this case would not effectuate the policies of the Act. The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE O'CONNOR, dissenting.

I agree with the Court that the National Labor Relations Board (NLRB) could reasonably determine in this case that reimbursing the petitioner is not necessary to effectuate the objectives of the National Labor Relations Act (Act). My disagreement is with the Court's conclusion that the Board provided an adequate explanation for its decision. The Board offered three reasons for its conclusion that reimbursing the petitioner would not effectuate the purposes of the Act. Each of its stated reasons was in error or inadequate to justify its conclusion. I would therefore remand the case to the Board in order to give it an opportunity to determine the appropriateness of reimbursement in light of the Court's opinion.

I

A brief review of the facts is useful in understanding the inadequacy of the Board's explanation for its decision.

For over a decade, there has been a dispute between respondent Building Material and Dump Truck Drivers, Teamsters Local 36 (Union), and respondent California Dump

Truck Owners Association (Association) over the availability of hauling jobs for nonunion truck operators. In June 1977, three contractors' associations, which are respondents in this case (Contractors), entered into a new master labor agreement (Agreement) with the Union which required signatory contractors to transport "all materials . . . to or from or on the site of the work by workmen furnished by the appropriate craft [union] . . . ." App. 10. The Agreement also required contractors to obtain the services of dump truck operators only through brokers who had signed an agreement with the Union and provided for penalties for contractors who failed to comply. Thus through the Agreement the Union required the Contractors to ensure that only signatory brokers received subcontracts for hauling and that only union operators performed hauling services.

Petitioner Larry Shepard is a self-employed dump truck operator. He accepted referrals from the Terra Trucking Co., a broker. In February 1978, Shepard entered into a subhaul agreement with Terra, under which the broker was authorized to make deductions from his earnings for a number of purposes, including "payroll benefits as required by the Union Agreement." *Id.*, at 22. When Shepard worked on union jobs, Terra deducted the appropriate amounts for payment to the Union's benefit funds.

Terra signed the Agreement and was therefore required to refer only union operators to contractors. In August 1978, Terra's president, Fred ReCupido, received a letter from the Union stating that seven of Terra's "employees," including Shepard, were not members in good standing of the Union. The letter requested that the seven be "removed from [Terra's] employ and not be rehired until properly cleared by [the Union]." *Id.*, at 27. ReCupido told the seven they would have to join the Union by September 5, 1978, if they wished to work through Terra. Shepard joined the Union in September 1978, and paid initiation fees and union dues

"under protest," on advice of counsel. Some of the other operators named in the Union's letter also joined at that time.

On August 25, 1978, Shepard's counsel filed unfair labor practice charges on behalf of Terra's nonunion operators alleging violations of both § 8(b)(4) of the Act, 29 U. S. C. § 158(b)(4)—the prohibition against secondary boycotts—and § 8(e), 29 U. S. C. § 158(e), the hot cargo provision. At the request of the Regional Director of the Board, those charges were withdrawn and replaced in October 1978 by charges alleging only a § 8(e) violation. The Regional Director joined Shepard's unfair labor practice charge with charges previously filed by the Association and issued a consolidated complaint against the Union and the Contractors alleging that the Agreement violated § 8(e).

After trial, an Administrative Law Judge found that the Union and the Contractors violated § 8(e) by agreeing not to do business with nonunion operators and their brokers. He found that since 1965, the Union had brought economic pressure against the Contractors in order "to achieve its goal of unionization of owner-operators," and that the Agreement was "part of the Union's continuing efforts to achieve its goal . . . ." 249 N. L. R. B. 386, 393 (1980).

The ALJ found that "Shepard joined the Union because of the letter Local 36 sent ReCupido." *Id.*, at 391. In addition to this specific finding, the ALJ made findings concerning another incident[1] and stated that "union membership of owner-operators, resulted from illegal provisions of the [Agreement]." *Id.*, at 394.

---

[1] The ALJ found that in November 1977, the Kissinger Trucking Co., a broker, entered into an agreement with a contractor, the Penhall Co., to supply hauling services. Shortly thereafter, Kissinger's manager was informed by Penhall's superintendent that the Union had said that Kissinger should be replaced because it was referring nonunion operators. Kissinger lost the contract with Penhall and subsequently signed the 1977 Agreement. 249 N. L. R. B., at 390.

The ALJ recommended that the Board issue a cease-and-desist order and require that notices of its ruling be posted conspicuously. In addition, the ALJ recommended that the Union and the Contractors be required to reimburse operators for payments to the Union. *Id.*, at 395.[2]

The Board upheld the ALJ's findings and conclusions but deleted his "make-whole" reimbursement order. The Board stated its reasons for doing so in a footnote which reads in relevant part:

> "[T]here is insufficient evidence in the record with respect to alleged losses directly attributable to actual coercion by [the Union and the Contractors]. Furthermore, we find a reimbursement order, typically used to "make whole" *employees* for violations of the Act, to be generally overbroad and inappropriate in the context of 8(e) violations. We note that aggrieved owner-operators engaged in business as independent contractors may pursue a damage claim under Sec. 303 of the Act. For the foregoing reasons, we find that the reimbursement of owner-operators ordered by the Administrative Law Judge would not effectuate the remedial policies of the Act. See *[Carpenters]* v. *N. L. R. B.*, 365 U. S. 651 (1961)." *Id.*, at 386, n. 2 (emphasis in original).

The United States Court of Appeals for the District of Columbia Circuit upheld the Board's refusal to order reimbursement, rejecting the contentions that the Board had failed to explain its decision adequately and that the relief ordered

---

[2] The recommended order, which was omitted from publication, would have required the Union and the Contractors "[j]ointly and severally [to] make whole all owner-operators . . . for all dues, initiation fees, assessments, and contributions to trust funds which . . . said owner-operators paid to [the] Union or its trust fund as a result of enforcement of the [illegal] provisions of the . . . Agreement." *Building Material and Dump Truck Drivers, Teamsters Local Union No. 36, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, No. 21–CE–197, slip op., at 18 (NLRB, Oct. 30, 1979).

was insufficient as a matter of law. 215 U. S. App. D. C. 373, 380, 669 F. 2d 759, 766 (1981).

## II

The broad language of § 10(c) of the Act, 29 U. S. C. § 160(c), compels the conclusion that the Board has the authority to order restitution of money unlawfully collected by a union, regardless of whether the money was collected from employees or other persons.[3] See *Virginia Electric & Power Co.* v. *NLRB*, 319 U. S. 533 (1943). Indeed, in a proceeding very similar to the instant case, the Board ordered reimbursement of independent owner-operators who joined a union as a result of the union's successful efforts to coerce an employer to enter into and enforce a hot cargo agreement. *Local 814, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Santini Brothers, Inc.)*, 208 N. L. R. B. 184 (1974), enf'd, 178 U. S. App. D. C. 223, 546 F. 2d 989 (1976), cert. denied, 434 U. S. 818 (1977).

The Board's first reason for denying reimbursement was that it found that there was "insufficient evidence in the record with respect to alleged losses directly attributable to coercion by [the Union and the Contractors]." There is however, ample evidence, as found by the ALJ, that Shepard and other Terra owner-operators joined the Union and paid initiation fees and dues,[4] against their

---

[3] I express no opinion as to whether the Board could, as the ALJ recommended here, require an employer to reimburse employees or independent contractors for funds unlawfully collected by a union with the acquiesence of the employer.

[4] Because Shepard signed the subhaul agreement, which authorized Terra to make deductions from his earnings for payments to the Union's benefit funds, prior to the Union's efforts to enforce the illegal provisions of the Agreement, it is not clear whether his payments to the benefit funds should be attributed to the Union's attempts to enforce the hot cargo provision.

will, as a result of the Union's effort to enforce an agreement which violated § 8(e).

The Board's second reason, that a reimbursement order is "generally overbroad and inappropriate in the context of 8(e) violations," cannot withstand scrutiny. Although it would be inappropriate to order reimbursement of persons who would have made payments to a union regardless of whether it had attempted to enforce an illegal provision, an order requiring that Shepard be reimbursed for the initiation fees and dues he paid to the Union would not be "overbroad and inappropriate" in light of the ALJ's finding that Shepard joined the Union as a result of the Union's effort to enforce the hot cargo provision. Cf. *Carpenters* v. *NLRB*, 365 U. S. 651 (1961).

As its third reason for refusing to order reimbursement, the Board stated that the owner-operators "may pursue a damage claim under Sec. 303 of the Act." But as the Board conceded, § 303 by its terms only creates a damages remedy for persons harmed by a § 8(b)(4) violation, not a § 8(e) violation. *Ante*, at 351. See *Connell Construction Co.* v. *Plumbers & Steamfitters*, 421 U. S. 616, 649, n. 9 (1975) (Stewart, J., dissenting). Thus in the absence of a finding of a § 8(b)(4) violation, petitioner could not successfully pursue a § 303 action.

It is true that the Court "will uphold a decision of less than ideal clarity if the agency's [reasons] may reasonably be discerned." *Bowman Transportation, Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U. S. 281, 286 (1974) (citation omitted). But as the Court ruled in *SEC* v. *Chenery Corp.*, 318 U. S. 80, 95 (1943), "[a]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." See *FPC* v. *Texaco Inc.*, 417 U. S. 380, 397 (1974). The Board's order in this case simply does not sup-

port its denial of reimbursement.[5]    I would therefore reverse the judgment of the Court of Appeals and remand this case to allow the Board to consider whether reimbursement of any or all of the funds paid to the Union by the petitioner is necessary to effectuate the Act's prohibition against hot cargo agreements.    See *NLRB* v. *Food Store Employees*, 417 U. S. 1 (1974).

---

[5] Unlike the majority, I do not believe that it can reasonably be discerned from the terse footnote quoted above that the Board has barred reimbursement in cases in which there is no finding of a § 8(b)(4) violation because "reimbursement should be reserved for especially egregious situations." *Ante*, at 350.