NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CHAUFFEURS, TEAMSTERS, WARE-
HOUSEMEN & HELPERS LOCAL 525,
affiliated with the International Broth-
erhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of Amer-
ica, Respondent.

No. 84-2505.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1985.

Decided Sept. 25, 1985.

John Walsh, Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Clyde E. Craig, Wiley, Craig, Armbruster & Wilburn, St. Louis, Mo., for respondent.

Before CUMMINGS, Chief Judge, ESCH-BACH, Circuit Judge, and WRIGHT, Senior Circuit Judge.*

* The Honorable Eugene A. Wright, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, is sitting by designation.

EUGENE A. WRIGHT, Senior Circuit Judge.

## FACTS

Helmkamp Construction Company (Helmkamp), a general contractor, previously maintained a fleet of trucks to fulfill its hauling needs and occasionally perform contract hauling for others. It was signatory to a collective bargaining agreement with Teamsters Local 525 (Union), due to expire April 30, 1983.

Late in 1982 Helmkamp decided to close down its trucking division and sell its trucks because it was no longer profitable. Future trucking needs would be satisfied by independent contractors.

In December 1982 or January 1983, Helmkamp's president, Byron Farrell, met with Union representative Marshall McDuffy, and disclosed Helmkamp's plans. McDuffy neither protested the decision nor requested bargaining over the effects of closing the trucking division. He expressed his regrets and noted the growing problem nationwide with owner-operators replacing Union drivers.

In response to a letter not in the record, Helmkamp wrote to the Union, and delivered a copy to McDuffy on February 28. The letter confirmed the plan to close the trucking operation, terminate the existing collective bargaining agreement effective at its expiration on April 30, 1983, and thereafter utilize lease agreements with independent owner-operators to satisfy Helmkamp's trucking needs. Farrell agreed to McDuffy's request to meet later with Illinois Conference of Teamsters President Bill Bounds.

In early March, Farrell, Bounds and McDuffy met and Farrell again repeated Helmkamp's intentions and offered to bargain over the effects of the impending closure of its trucking operation. In April, Bounds wrote to request negotiations to continue or replace the existing collective bargaining agreement. Farrell responded by letter of April 18, 1983 that Helmkamp still intended to eliminate the trucking division and saw no need to enter into a new collective bargaining agreement since it would no longer employ any truck drivers. He reiterated his willingness to bargain, however, over the effects of the termination. He received no response.

Farrell called McDuffy again in May to remind him that liquidation of Helmkamp's trucks was nearing completion. McDuffy requested that Helmkamp postpone sale of the last few trucks pending a later meeting.

They met on August 18, 1983. McDuffy presented Farrell with two contracts and demanded that Helmkamp sign one. Both contained clauses requiring Helmkamp to carry owner-drivers on its payroll and require them to join the Union as a condition of doing business with Helmkamp.[1] Far-

---

1. The two contracts, one a multi-employer agreement between the Illinois Conference of Teamsters (Teamsters) and the Associated General Contractors of Illinois, the other between the Teamsters and individual employers covering three local union jurisdictions, ban the subcontracting of work on the basis of union membership and contain the following pertinent clauses:

### ARTICLE XXIV
### OWNER–DRIVER

24.1 The Term "Owner-Driver" means an individual, who, in addition to being employed to perform services covered by this Agreement is also the owner and operator of the equipment. Legal or equitable title must be in the name of the driver. The following provisions shall apply to all Owner-Drivers engaged to perform work.

24.2 The Owner-Driver shall be carried on the payroll of the Employer as an employee and as such, all the terms and conditions of this Agreement, including Article IV, Procurement of Labor, shall be applicable to him. A separate referral list will be kept for Owners-Drivers.

### ARTICLE III
### UNION SECURITY

3.1 It is understood and agreed by and between the parties hereto that as a condition of continued employment and effective after the seventh day following the beginning employment or the execution date of this Agreement, whichever is the later, all persons hereafter employed to work within the bargaining unit which is the subject of the Agreement, as well as all persons presently so working but who are not members of one of the Local Unions referred to herein, shall become members of the particular Local Union having jurisdiction for representation purposes over the geographical area within which such persons then work. It is further understood and agreed that as a condition of continued employment all persons

rell refused to sign because Helmkamp would no longer own any trucks nor have need for drivers. McDuffy said it made no difference and they would "both have to get [their] best hold and [see what would happen]."

On August 19, Farrell received a telegram from Bounds stating that Helmkamp had the Union's last and best offer and if it refused to sign the Union would "take all legal economic recourse that they [deemed] necessary."

Helmkamp sold or leased its remaining trucks and laid off the last of its drivers on August 23. Helmkamp has since utilized only independent contractors.[2] On August 26, the Union struck Helmkamp and began to picket. The picketing expanded to various construction sites until it was halted on September 7, pursuant to a temporary restraining order issued by the district court for the Southern District of Illinois. Helmkamp signed a new collective bargaining agreement on September 21, 1983, containing the disputed Union membership requirements. In return, the Union agreed not to enforce the disputed clauses pending judicial determination of their legality.

The Regional Director of the Board issued a complaint alleging that the Union violated Sections 8(b)(4)(A) and (B) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(b)(4)(A) and (B), by picketing and threatening to picket Helmkamp to force the self-employed owner-drivers to join the Union and to force Helmkamp to enter into an agreement prohibited by Section 8(e) of the Act, 29 U.S.C. § 158(e).

In a well reasoned, thorough opinion the Administrative Law Judge concluded the Union was guilty of unfair labor practices. He ordered the Union to cease its efforts to pressure Helmkamp and to rescind the unlawful provisions in the collective bargaining agreement. The Union filed exceptions and the Board affirmed the ruling.

The Union declined to comply and the Board has sought to enforce its order. We have jurisdiction pursuant to 29 U.S.C. § 160(e).

## ANALYSIS

### I. Standard of Review

■■■ We uphold findings of fact by the NLRB if supported by substantial evidence on the record as a whole. *NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675, 691–692, 71 S.Ct. 943, 952–953, 95 L.Ed. 1284 (1951); *NLRB v. Milk Drivers Union, Local No. 753*, 392 F.2d 845, 847 (7th Cir.1968). We also accord weight to "the Board's interpretation of the Act and the Board's application of it in doubtful situations...." *Denver Building Trades*, 341 U.S. at 691–692, 71 S.Ct. at 952–953. Whether the Union was motivated by secondary objectives is a question of fact. *Milk Drivers*, 392 F.2d at 847.

### II. The Contracts

Section 8(e) of the NLRA prohibits "any contract or agreement ... whereby [an] employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer or to cease doing business with any other

who are presently members in good standing of one of the Local Unions referred to herein or who hereafter become such shall be required to pay the periodic dues of the local Union having jurisdiction for representation purposes over the geographical area within which such persons work a majority of the time figured on a month by month basis.

3.3 The failure of any person to become a member of a Local Union in the manner and within the time above provided for shall obligate his Employer, upon written notice from the Union to such effect and to the further effect that Union membership was available to such

person on the same terms and conditions generally available to other members, to forthwith discharge such person. Further, the failure of any person to pay the monthly periodic dues required shall, upon written notice from the Union to his Employer to such effect, obligate his Employer to discharge him forthwith.

**2.** The Union does not appear to challenge the ALJ's finding that all subsequent hauling has been done by true independent contractors. In any event, the record amply supports this finding.

person." 29 U.S.C. § 158(c). It prohibits only "agreements calculated to satisfy 'secondary' objectives." *Building Material and Dump Truck Drivers, Teamsters Local Union No. 36 v. NLRB*, 669 F.2d 759, 764 (D.C.Cir.1981), *aff'd on other grounds sub nom. Shepard v. NLRB*, 459 U.S. 344, 103 S.Ct. 665, 74 L.Ed.2d 523 (1983).

The Union argues the disputed clauses were legitimately designed to preserve work for its members. *See National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 634, 87 S.Ct. 1250, 1262, 18 L.Ed.2d 357 (1967). The test is whether "under all the surrounding circumstances, the Union's objective was preservation of work ... or whether the agreements ... were tactically calculated to satisfy union objectives elsewhere." *Id.* at 644, 87 S.Ct. at 1268.

Generally "[a]greements which limit the employer, here [Helmkamp], to subcontracting with businesses that recognize the union or have a union contract violate section 8(e)." *Building Material*, 669 F.2d at 764; *accord A. Duie Pyle, Inc. v. NLRB*, 383 F.2d 772, 777–78 (3d Cir.1967), *cert. denied*, 390 U.S. 905, 88 S.Ct. 819, 19 L.Ed.2d 871 (1968); *Local 814, International Brotherhood of Teamsters v. NLRB*, 546 F.2d 989 (D.C.Cir.1976), *cert. denied*, 434 U.S. 818, 98 S.Ct. 56, 54 L.Ed.2d 73 (1977).

The clauses at issue here, which require owner-operators to join the Union by requiring them to be carried on the payroll as employees, are union signatory clauses which focus on the union affiliation of, rather than the compensation paid, a subcontractor's employees. *See Local 814, International Brotherhood of Teamsters v. NLRB*, 512 F.2d 564, 566 (D.C.Cir.1975); *NLRB v. Hotel & Restaurant Employees & Bartenders Union, Local 531*, 623 F.2d 61, 67 (9th Cir.1980). They are presumptively invalid. *See id.; Local 644, United Brotherhood of Carpenters & Joiners of America v. NLRB*, 533 F.2d 1136, 1149 (D.C.Cir.1975) ("work preservation strikes

must be blind to the organizational status of remote employers").

■ The distinction between union signatory and union standards clauses is firmly established. The latter are generally valid while the former are not. *See, e.g., NLRB v. National Maritime Union of America*, 486 F.2d 907, 912–13 (2d Cir.1973) (discussion of rationale and policy reasons behind distinction), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974); *Retail Clerks International Ass'n. Local Union No. 1288 v. NLRB*, 390 F.2d 858, 861 (D.C. Cir.1968); *see generally* Gorman, *Labor Law*, pp. 266–267 (1976).

■ The two contracts here do not ban the subcontracting of bargaining unit work altogether. In *National Woodwork*, the seminal Supreme Court case upholding work preservation clauses, the Court emphasized that the contract at issue precluded all pre-fitted doors, regardless of whether fitted off jobsite by union or non-union labor. *National Woodwork*, 386 U.S. at 646, 87 S.Ct. at 1269. In contrast, the vice in the disputed clauses here is that they condition subcontracting out work solely on the basis of union membership.

The Union attempts to distinguish similar cases in other circuits (*e.g., A. Duie Pyle*) because the independent contractors there had long-standing relationships with the contractor. We find that distinction unpersuasive. The duration of the relationships among the Union, the employer and independent contractors is relevant only to the extent it sheds light on the purpose of the clause at issue.

The record indicates that the Union knew of Helmkamp's plans by February 1983. It waited until August when all but a few of Helmkamp's trucks were sold, then presented contracts which required that independent owner-drivers join the Union to do contract hauling for Helmkamp. Under the facts of this case, the ALJ was justified in concluding that the Union had a secondary purpose, unionization of the indepen-

dent contractors. The contracts are thus prohibited by Section 8(e).

### III. The Strike

■ Section 8(b)(4)(A) of the NLRA, 29 U.S.C. § 158(b)(4)(A), prohibits strikes by labor organizations designed either to force a self-employed person to join a labor organization or to force an employer to enter into an agreement prohibited by Section 8(e). However, "[o]nly 'secondary' conduct is proscribed...." *George E. Hoffman & Sons, Inc. v. International Brotherhood of Teamsters, Local No. 627*, 617 F.2d 1234, 1241 (7th Cir.), *cert. denied*, 449 U.S. 937, 101 S.Ct. 335, 66 L.Ed.2d 160 (1980). The secondary purpose need not be the sole motivation of the strike to violate § 8(b)(4)(A). *NLRB v. Milk Wagon Drivers Union, Local 753*, 335 F.2d 326, 329 (7th Cir.1964).

This Union violated Section 8(b)(4)(A) by striking to force Helmkamp to sign the prohibited agreements.

Furthermore, the ALJ found the strike was motivated, at least in part, to force the independent owner-drivers to join the Union. We find substantial evidence in the record to support this finding. The Union struck, after Helmkamp had sold or leased all its trucks and no longer employed any drivers. The Union's conduct throughout indicates that it was resigned to Helmkamp's decision, motivated by economic reality, to close down its trucking operation. The logical inference is that the subsequent strike was aimed at the independent owner-drivers.

### CONCLUSION

The evidence supports the ALJ's conclusion that the Union struck Helmkamp to force the independent owner-drivers to join the Union and to force Helmkamp to enter into an agreement prohibited by Section 8(e) of the NLRA, 29 U.S.C. § 158(e). This conduct violated Section 8(b)(4)(A) of the NLRA, 29 U.S.C. § 158(b)(4)(A). We need not determine whether it also violated Section 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B).

The Board's order is enforced.