**TEAMSTERS LOCAL UNION NO. 639, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**ASSOCIATION OF D.C. LIQUOR WHOLESALERS and its Members, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Teamsters Local Union No. 639, Intervenor.**

**Nos. 89–1141, 89–1179.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 9, 1990.

Decided Jan. 29, 1991.

---

Hugh J. Beins, with whom Jonathan G. Axelrod, Washington, D.C. was on the brief, for Teamsters Local Union No. 639, petitioner in 89–1141 and intervenor in 89–1179. Kathleen A. Murray, Washington, D.C. also entered an appearance for Teamsters Local Union No. 639.

Benjamin E. Goldman, Washington, D.C. for Ass'n of D.C. Liquor Wholesalers, and its Members, et al., petitioners in 89–1179. Linda Hitt Thatcher, Washington, D.C. and Stewart S. Manela, Vienna, Va. also entered appearances for Ass'n of D.C. Liquor Wholesalers, and its Members, et al.

Margaret G. Bezou, Atty., N.L.R.B., with whom Aileen A. Armstrong, Deputy Corp. Counsel, and Peter D. Winkler, Atty., N.L.R.B., Washington, D.C., were on the brief, for respondent.

Before BUCKLEY, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge HENDERSON.

HENDERSON, Circuit Judge:

In this consolidated proceeding, an association of employers and a union seek review of an order of the National Labor Relations Board (the Board); the Board cross-applies for enforcement of its order. The employers contest the Board's conclusion that they violated the National Labor Relations Act by prematurely declaring a bargaining impasse and by locking out and replacing their employees. The union assigns as error the Board's failure to award back pay to those individuals the employers would have hired from the union hiring hall had they not improperly procured replacement employees from another source. Finding no merit in the contentions of either party, we deny their petitions for review and grant the Board's application for enforcement of its order.

I.

The Association of D.C. Liquor Wholesalers (the Association) is an organization composed of three businesses that sell wine and liquor in the District of Columbia. One of the Association's functions is to represent its members in negotiating and administering collective bargaining agreements with the various labor unions that represent the members' employees. In early 1987, the Association entered negotiations with Local 639 of the Teamsters Union (the Union), which represented the Association members' drivers, warehousemen and helpers. The parties sought to produce a successor contract to the collective bargaining agreement scheduled to expire on February 28, 1987. On previous occasions, the Association had represented its members in collective bargaining with the Union. In 1984, during the parties' negotiations, the Union had staged a strike that lasted for seven weeks until the Association's members threatened to replace the strikers permanently. As a result of the threatened replacement, the Union had agreed to substantial concessions in several key areas of the contract, including a two-tier wage system and a caseload-helper limit.[1]

---

1. Under the two-tier wage system to which the Union agreed in 1984, the Association members paid newly hired employees at a lower rate than they paid those already employed at the time of the contract. The caseload-helper limit refers to the minimum number of liquor cases that a driver must deliver before a helper can accompany him during his delivery route. Under the terms of the 1984 contract, a driver was entitled to a helper on his delivery route only when he delivered more than 150 cases of liquor.

The parties began bargaining for the new contract on January 21, 1987, with Ronald Ross serving as the Union's primary representative and Ronald Tisch bargaining for the Association. The Union entered the negotiations intending to win back many of the concessions to which it had acceded in the previous contract, while the Association went in planning to extract further, although at first undefined, concessions from the Union. In keeping with their previous practice, the parties reserved the economic aspects of their negotiations until the later bargaining sessions, nearer to the expiration of the previous contract. As the bargaining progressed, the two sides reached agreement on some of the noneconomic issues but they failed to agree on several economic questions. The Association sought to reduce its labor-related costs, including its legal aid contributions and contributions to the employees' health and pension plans. Throughout the negotiations, marked disagreement existed between the parties on the questions of the two-tier wage system and the caseload-helper limit. After the fifth of twelve bargaining sessions, and before any breakdown in negotiations, the Association retained a private security firm to interview and hire replacement employees.

On Friday, February 27, at what was to be their final bargaining session, the parties took up the issue of wages. A federal mediator was present at this session. The Association first proposed to cut wages by $2.77/hour. The Union rejected the proposed wage cut, demanding instead increased wages. The parties continued to exchange proposals late into the afternoon until the federal mediator asked the two sides to submit their final proposals. The Association again submitted a proposal that included a wage cut and other elements the Union found unacceptable. The Union responded with an offer that the Association rejected. After the rejection of what was supposed to be its final offer, however, the Union submitted another proposal and the Association entertained but ultimately rejected it.

Finally, the Union negotiator informed the Association representative that, at that time, the Union would make no better offer. On learning that the Union planned to offer no further concessions, Tisch, the Association negotiator, declared that the parties had reached impasse. Ross, the Union negotiator, immediately disagreed with the declaration of impasse and accused the Association of "trying to bust the Union." He also stated his intention to seek strike authorization at the Union meeting the next day.

Tisch responded by stating that, if the Union struck one of the Association's members as it threatened to do, the other employers had agreed to lock out their employees as well. In the event of a strike, Tisch stated, the Association employers were prepared to continue operations with temporary replacements. Tisch also informed the Union that, because the parties had reached impasse, the Association planned to implement its final offer. He gave the Union employees until the following Wednesday to report for work under the terms of the Association's final offer. Tisch stated that the Association employers intended to replace any employees failing to appear for work under those terms.

Over the weekend following this final bargaining session, the Union membership authorized a strike, but Union officials instructed the members to report for work at the regular time on Monday morning. After the strike vote, Ross and the Union president contacted Tisch in an attempt to resume negotiations. They stated that the Union employees would continue to work under the terms of the expired contract until a new one could be negotiated. They further stated that the Union would file unfair labor practice charges if the Association carried out the threat to implement its final offer. On behalf of the Association, Tisch refused to meet with the Union representatives for further negotiations.

When the employees attempted to report for work on Monday, their employers read them the following statement: "Your contract has expired. There is no agreement between the Union and management on a new contract. No contract no work. You are locked out." The Association members

continued operations with the replacement employees for whom they had arranged earlier. At the federal mediator's urging, the parties met again on March 26. When the meeting began, the Union served Association negotiator Tisch with unfair labor practice charges. The parties argued and the Association negotiators walked out. By letters dated March 27 and June 23, the Union again sought to resume negotiations. The Association refused to respond to either of these overtures.

The Administrative Law Judge (ALJ) concluded that the parties' negotiations had not reached impasse when the Association terminated negotiations on February 27. The finding of no valid impasse proceeded from the ALJ's conclusion that the Association had acted in bad faith during the negotiations: it "entered bargaining in an appraisal of what the Union probably would not ultimately accept and appears to have formulated its position accordingly." ALJ Decision at 39 (May 17, 1988), *reproduced as appendix to Association of D.C. Liquor Wholesalers,* 292 NLRB No. 132 (Feb. 21, 1989) (hereinafter ALJ). The ALJ also found that the Association's refusal to bargain came before the Union had had the opportunity to "fully explore and negotiate [the Association's] finally revealed full hard core economic position." ALJ at 40. Having concluded that the parties had not reached impasse, the ALJ determined that the Association's refusal to bargain after February 27 violated sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act (the Act).[2] ALJ at 41. He further held that, in the absence of a valid impasse, the Association's implementation of its final offer effected unilateral changes in mandatory bargaining subjects and constituted a

separate violation of sections 8(a)(5) and 8(a)(1). ALJ at 41. Finally, the ALJ concluded that the lockout was an attempt to coerce the Union to accept the Association's unlawfully implemented final offer. As such, it constituted an independent refusal to bargain in violation of sections 8(a)(5) and 8(a)(1). ALJ at 42. Because the lockout discriminated against the employees for their participation in protected collective bargaining activity, the ALJ found that it also violated section 8(a)(3) of the Act.[3] ALJ at 42.

On review, the Board affirmed the ALJ's decision although it rejected the ALJ's "suggesti[on]" that the Association had acted in bad faith throughout the negotiations. Nevertheless, it concluded that, on February 27, the Association had formulated its wage proposals "specifically to avoid its obligation to bargain in good faith." *Association of D.C. Liquor Wholesalers,* 292 NLRB No. 132 at 5, 130 LRRM (BNA) 1256, 1257 (Feb. 21, 1989). In light of the Association's bad-faith bargaining on the final day, the Board concluded that the parties had not reached impasse in their negotiations. Two other Board findings also supported its conclusion that the parties had not bargained to impasse. First, the Board found that the Union representative immediately "strongly disagreed that impasse had been reached." 292 NLRB No. 132 at 4, 130 LRRM at 1257; *see also id.* at 7, 130 LRRM at 1258. Second, the Board found that the parties had negotiated on wages too briefly "to have exhausted all reasonable expectations of compromise." *Id.* at 4, 130 LRRM at 1257.[4]

Having found no impasse, the Board ruled that the Association's refusal to ne-

2. These sections of the Act make it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]" of the Act,. 29 U.S.C. § 158(a)(1), or "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5).

3. Section 8(a)(3) of the Act provides that it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership

in any labor organization." 29 U.S.C. § 158(a)(3).

4. One Board member concurred in the Board's ruling but found it unnecessary to reach the question of the Association's bad faith during the negotiations. She concluded that the facts showed the parties had not exhausted the possibilities for agreement. Because this alone was sufficient to support the finding of no impasse, she would not have addressed the question of bad faith. 292 NLRB No. 132 at 2 n. 3, 130 LRRM 1256 n. 3.

gotiate after February 27 and its unilateral implementation of its final offer violated sections 8(a)(5) and 8(a)(1) of the Act. *Id.* at 9, 130 LRRM at 1259. It further agreed with the ALJ that the lockout and replacement of employees violated sections 8(a)(5), 8(a)(3) and 8(a)(1). *Id.* at 10, 130 LRRM at 1259. The Board ordered the Association to recognize and bargain with the Union and ordered the employers to offer reinstatement and back pay to all employees terminated as a result of the lockout. These petitions for review followed.

## II.

■ A bargaining impasse is "the deadlock reached by bargaining parties 'after good-faith negotiations have exhausted the prospects of concluding an agreement.'" *Teamsters Local Union No. 175 v. NLRB,* 788 F.2d 27, 30 (D.C.Cir.1986) (quoting *Taft Broadcasting Co.,* 163 NLRB 475, 478 (1967)). It occurs at the point in negotiations when "there [is] no realistic prospect that continuation of discussion at that time would ... [be] fruitful." *American Fed'n of Television & Radio Artists v. NLRB,* 395 F.2d 622, 628 (D.C.Cir.1968) (*AFTRA* ). In the absence of impasse, a party refusing to negotiate on a mandatory bargaining topic violates section 8(a)(5) of the Act. *NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962).

■ In reviewing the Board's determination of impasse, we are mindful of its accumulated expertise in the area: "in the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems." *Dallas Gen. Drivers Local Union No. 745 v. NLRB,* 355 F.2d 842, 844–45 (D.C.Cir.1966). We will substitute our judgment for that of the Board only when the Board's decision lacks the support of substantial evidence in the record viewed as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *see also Teamsters Local Union No. 175,* 788 F.2d at 30; *District 65 Distributive Work-*

*ers of America v. NLRB,* 593 F.2d 1155, 1164 (D.C.Cir.1978).

■ In determining whether parties have exhausted the possibilities of agreement, the Board has "no fixed definition of an impasse ... which can be applied mechanically to all factual situations." *Dallas Gen. Drivers,* 355 F.2d at 845. It considers a number of factors, including the "bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations." *Taft Broadcasting Co.,* 163 NLRB 475, 478 (1967), *petition for review denied sub nom. AFTRA v. NLRB,* 395 F.2d 622 (D.C.Cir.1968). Our review of the record reveals substantial evidence of at least two of these factors to support the Board's finding of no impasse.

First, we find support for the Board's conclusion regarding the length of the parties' negotiations on wages. By the time the Association declared impasse, the parties had met twelve times over the course of a month; however, they had agreed to postpone any discussion of wages until the final session. The Board specifically found that it was "the Union's rejection of [wage] cuts that primarily led to the [Association] declaring impasse." 292 NLRB No. 132 at 6 n. 8, 130 LRRM at 1258 n. 8. The fact that the wage negotiations lasted only one day supports the Board's conclusion that the parties had had an inadequate opportunity to "fully explore and negotiate [the Association's] finally revealed full hard core economic position." ALJ at 40.

The Association would have us hold that, although the parties bargained only for one day on the issue of wages, the negotiations were nonetheless deadlocked because the parties had bargained at length—and unsuccessfully—over other economic issues like the two-tier wage system and the caseload-helper limit. Because all labor-related expenses "come out of the same pot," the Association insists that the parties had reached a *bona fide* impasse in that several economic issues remained unresolved at the

time the Association declared impasse. To accept this argument, however, would negate the deference we are required to extend to the Board's findings of fact. *See supra* at 1083. In light of the Board's express finding that the "Union's rejection of [wage] cuts," 292 NLRB No. 132 at 6 n. 8, 130 LRRM at 1258 n. 8, caused the Association to declare impasse, we reject the Association's argument that its refusal to negotiate further proceeded from a deadlock on broader economic questions.[5]

■ The last of the *Taft* factors—the "contemporaneous understanding of the parties as to the state of negotiations," 163 NLRB at 478—also supports a finding of no impasse. If either negotiating party remains willing to move further toward an agreement, an impasse cannot exist: the parties' perception regarding the progress of the negotiations is of central importance to the Board's impasse inquiry. *See Saunders House v. NLRB*, 719 F.2d 683, 688 (3d Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 554 (1984) (impasse finding "often depends on the mental state of the parties"); *Huck Mfg. Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir.1982) (finding of no impasse supported by fact that "Union's chief negotiator testified that he never felt the parties were at an impasse"). Both the ALJ and the Board found that, immediately after the Association negotiator declared impasse, Ross, the Union negotiator, "strongly disagreed" with that characterization of the negotiations. ALJ at 26; 292 NLRB No. 132 at 4, 130 LRRM at 1257. They further found that Ross

stated he had more movement to make.[6] ALJ at 28; 292 NLRB No. 132 at 4, 130 LRRM at 1257. These Union protestations manifest that one party did not view the negotiations as having reached impasse; they provide substantial evidence to support the Board's finding of no impasse and we therefore decline to disturb it.

Before us, the Association argues that the Board erred when it examined the content of the Association wage proposals in reaching the conclusion that the Association engaged in bad-faith bargaining. The Association contends that this asserted error in the Board's reasoning justifies reversal of the Board's finding of no impasse. We disagree. The evidence regarding the length of the wage negotiations and the Union's view of the state of the negotiations is, on its own, sufficient to justify the Board's finding of no impasse. Accordingly, we need not reach the Board's bad faith determination.

■ Once we have determined that the Board's finding of no impasse rests on substantial record evidence, few questions remain regarding the Association's petition for review. In the absence of a bargaining impasse, an employer violates section 8(a)(5) of the Act by "refus[ing] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). An employer also violates its bargaining obligation under section 8(a)(5) if, without having negotiated to impasse, it unilaterally changes its employees' terms or conditions of employment. *NLRB v. Katz*, 369 U.S. at 743, 82 S.Ct. at 1111; *Teamsters Local*

---

5. In connection with this argument made by the Association, we note that the record contains evidence indicating that the parties might have reached an agreement on the question of the two-tier wage system. An Association negotiator testified that he had more movement to make on the two-tier issue. This evidence lends further support to the Board's determination that the parties were not deadlocked.

6. The Association contends that, in determining the Union's perception of the state of negotiations, the Board improperly relied on post-impasse events. The Association correctly asserts that the Board may not premise its impasse finding on events occurring after the declaration of impasse. *See Francis J. Fisher, Inc.*, 289 NLRB No. 104, 131 LRRM 1082 (1988) (impasse

may not be found "on the basis of subsequent events"); *see also Cheney California Lumber Co. v. NLRB*, 319 F.2d 375, 380 (9th Cir.1963) (error to reach impasse decisions "judged on a basis of hindsight"). Here, however, the Board committed no such error. The record shows that, *on February 27*, Ross "strongly disagreed," ALJ at 26, with and "vociferously disputed," 292 NLRB No. 130 at 7, 130 LRRM at 1258, the Association's declaration of impasse. These events occurred contemporaneously with the impasse declaration. That the Board also discussed later events in support of its impasse decision does not weaken this evidence of contemporaneous conduct on which it properly relied to support its conclusion.

*175,* 788 F.2d at 30. Because the parties did not reach impasse on February 27, we uphold the Board's ruling that the Association's refusal to participate in further negotiations and its unilateral implementation of its final offer violated section 8(a)(5) of the Act.

■ We also uphold the Board's conclusion that the Association violated the Act when it locked out and replaced its employees. When an employer locks out its employees for the purpose of evading its duty to negotiate with the employees' bargaining representative, the employer violates sections 8(a)(5) and 8(a)(1) of the Act. *See American Cyanamid Co v. NLRB,* 592 F.2d 356, 364 (7th Cir.1979) (finding § 8(a)(5) violation when employer's "lockout was to compel acceptance of ... its unfair labor practice"); *see also Hopwood Retinning Co.,* 4 NLRB 922, 940, *enforced,* 98 F.2d 97 (2d Cir.1938). By locking out and replacing its employees, an employer may also violate section 8(a)(3) of the Act although such actions do not automatically run afoul of this provision. *See American Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965); *NLRB v. Brown,* 380 U.S. 278, 283–84, 85 S.Ct. 980, 983–84, 13 L.Ed.2d 839 (1965); *International Bhd. of Boilermakers, Local 88 v. NLRB,* 858 F.2d 756, 760–62 (D.C. Cir.1988). In the case of a "bargaining" lockout, however, the lockout, to be permissible, must be for the "sole purpose of bringing economic pressure to bear in support of [the employer's] legitimate bargaining position." *American Ship Bldg.,* 380 U.S. at 318, 85 S.Ct. at 967. Here, the Association employers' lockout and replacement of their employees does not meet this standard. The employers locked out their employees in an attempt to coerce the Union to accept the Association's unilaterally implemented final offer. As discussed above, *see supra* at 1084–85, the unilateral implementation of the final offer constitutes an unfair labor practice. It therefore does not qualify as a "legitimate bargaining position" that the employers may pursue through the use of a lockout. Accordingly, we conclude that the Board correctly held the lockout and hiring of replacements to violate sections 8(a)(5), 8(a)(3) and 8(a)(1).

## III.

The collective bargaining agreement that expired on February 28, 1987, provided for a Union hiring hall. The Union contends that the Association employers violated the Act by hiring replacement employees from outside the hiring hall. By way of remedy, the Union asks us to modify the Board's order to award back pay to those individuals who would have been hired from the hiring hall had the Association employers not obtained their replacement employees elsewhere.

■ The Board enjoys "broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." *Sure Tan, Inc. v. NLRB,* 467 U.S. 883, 898–99, 104 S.Ct. 2803, 2812–13, 81 L.Ed.2d 732 (1984). A party challenging the Board's choice of remedy must show that the remedy is "clearly inadequate in light of the findings of the Board." *International Union of Elec. Workers, Local 806 v. NLRB,* 434 F.2d 473, 478 (D.C.Cir.1970). We will disturb the Board's remedy only when it amounts to an abuse of discretion. *NLRB v. Food Store Employees Union, Local 347,* 417 U.S. 1, 10, 94 S.Ct. 2074, 2080, 40 L.Ed.2d 612 (1974). The Act does not require the Board to "order that which a complaining party may regard as 'complete relief' for every unfair labor practice." *Shepard v. NLRB,* 459 U.S. 344, 352, 103 S.Ct. 665, 670, 74 L.Ed.2d 523 (1983). The Board ordered the Association to offer reinstatement and back pay to the locked out employees. ALJ at 45; 292 NLRB No. 132 at 10. In light of the remedies that the Board has provided, we cannot say that the Board's refusal to also order the back pay that the Union now seeks amounts to an abuse of discretion. The Board's choice of remedy does not "attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *See Virginia Elec. & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568

(1943). We therefore deny the Union's petition for review.

### IV.

In sum, we uphold the Board's ruling that the Association employers' declaration of impasse, their refusal to bargain with the Union and their subsequent lockout and replacement of their employees violated the National Labor Relations Act. We further approve the remedial provisions of the Board's order and decline to modify it as the Union asks us to do. Because we deny both petitions for review, we direct that the Board's order be

*Enforced.*

