Richard AMBURGEY, Plaintiff,

v.

Jo Anne B. BARNHART,[1] Commis-
sioner of Social Security Ad-
ministration, Defendant.

No. CIV.A. H–01–3881.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 20, 2003.

1. Jo Anne B. Barnhart was appointed Commissioner of the Social Security Administration effective November 9, 2001 and, accordingly, is named as the Defendant in this matter.

Robert C Hardy, Sr, Attorney at Law, Houston, TX, for Richard C Amburgey, plaintiff.

Tasha Williams Stevenson, Special Ass't U.S. Atty, Dallas, TX, for Jo Anne B Barnhart, Commissioner of SSA, defendant.

## MEMORANDUM AND ORDER

HOYT, District Judge.

Having conducted a review of the Memorandum and Recommendations [Doc. # 23], as well as all other materials on file in this proceeding and noting that no Objections have been filed to the Memorandum and Recommendations, this Court finds that the Memorandum and Recommendations are well founded and are adopted herein. It is, therefore,

**ORDERED** that the Commissioner's Motion for Summary Judgment [Doc. # 21] is **GRANTED**. Further, it is

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 20] is **DENIED**. Additionally, it is

**ORDERED** that this matter is **DISMISSED** with prejudice from the Court's docket.

The Clerk of Court shall file this Memorandum and Order and provide the parties with a true copy.

## MEMORANDUM AND RECOMMENDATIONS

Plaintiff Richard C. Amburgey ("Amburgey") seeks judicial review of the Social Security Administration's ("SSA") denial of his claim for disability and supplemental security income benefits provided by Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 405 and 1381, *et seq. See* Plaintiff's Motion for Summary Judgment (Entry # 20). Defendant Jo Anne B. Barnhart, Commissioner of the Social Security Administration ("Commissioner"), urges

the decision denying Amburgey's claim for benefits be upheld and maintains the claimant is not disabled as he is able to perform both semiskilled and unskilled sedentary work, such jobs found to exist in significant numbers in the national economy. *See* Defendant's Motion for Summary Judgment (Entry # 21) and Response to Plaintiff's Motion for Summary Judgment (Entry # 22).[2] Amburgey contends that the administrative law judge ("ALJ") improperly relied upon and coached the medical expert's testimony when rejecting the opinion of an examining psychiatrist that the claimant was incapable of working. *See* Plaintiff's Motion for Summary Judgment (Entry # 20). Amburgey further maintains that the Commissioner's decision should be reversed or remanded, contending that it is not premised upon substantial evidence and does not comply with applicable legal standards. Conversely, the Commissioner contends that the finding that Amburgey is not disabled, is based upon a complete review of the claimant's testimony and medical records as well as the opinions of treating physicians and those of the vocational and consulting medical experts and, accordingly, the Commissioner affirmed the ALJ's decision that Amburgey is not disabled and retains the residual functional capacity to perform semiskilled and unskilled sedentary work, and maintaining that the ALJ's findings are based upon substantial evidence and a proper application of the relevant legal standards. *See* Defendant's Motion for Summary Judgment (Entry # 21). The Commissioner disputes Amburgey's claims and contends that affirming the denial of the claim for supplemental security income benefits is the only proper conclusion to this matter.

Following a review of the motions, the responses and the administrative record, it is recommended that the ALJ's findings be affirmed, for the below stated reasons.

## THE EVIDENTIARY RECORD

### A. Age, Education & Work Experience

Richard Charles Amburgey is a forty-four (44) year old, single male with no minor children. Amburgey has earned two years of college credits at North Harris County Community College and has past work experience as a self-employed commercial paper hanger and painter. (T. 43, 79; R. 136–138, 165, 203–208, 288).[3] Amburgey ceased working January 1, 1997, as a result of alleged chronic pain in his right knee and lower back resulting from degenerative disc disease and osteoarthritis. (R. 24, 178, 182, 184–187, 365–366, 371; T. 47–48).

### B. The Medical Evidence

In July of 1983, Amburgey was seen by Dr. Bill Alexander at Doctors Hospital in Conroe, with complaints of pain, slight swelling and a locking of the right knee, suffered after having been struck with a baseball on the medial side of the right knee. A physical examination revealed that the right knee showed mild atrophy of the quads with mild effusion. The knee's range of motion was normal but there was tenderness along the suprapatellar area and on the lateral joint line. There was no

---

**2.** Defendant's Motion for Summary Judgment (Entry # 21) and Response to Plaintiff's Motion for Summary Judgment (Entry # 22) will henceforth be referred to as the single instrument, Defendant's Motion for Summary Judgment (Entry # 21).

**3.** References made to statements taken from that portion of the administrative record identified as the "transcript" of the administrative hearing are designated "T," followed by the applicable page number(s) of the record; and, references made to items contained in the remainder of the record are designated "R," followed by the applicable page number(s).

loose body palpated and the lateral and cruciate ligaments were intact with no inflammation or infection of the knee. Dr. Alexander noted that on previous knee examinations loose bodies were palpated and he recommended their evaluation and removal. The remaining physical and neurovascular examinations revealed normal results. Dr. Alexander performed an arthroscopy of the right knee on July 26, 1983, and removed the loose bodies. Chondromalacia was present on the undersurface of the patella as well as the lateral femoral condyle. The chondromalacia of the patella and the femoral was shaved and smoothed. The surgical procedure went well, however, Dr. Alexander assessed Amburgey as having a ten percent (10%) disability in the right knee. (R. 245–247, 297).

In October of 1985, Amburgey returned to Dr. Alexander at Medical Center Hospital in Conroe, Texas, with complaints that his knees were popping and locking and that he had pain and swelling in both knees. An examination revealed normal results, except for the left foot which showed an old, healed mid-foot amputation and both knees displayed crepitation with flexion and extension particularly at the patella. There were no effusions and the range of motion and ligaments were normal. A chest x-ray was taken revealing a normal heart with clear lungs. Dr. Alexander recommended an arthroscopy for the removal of probable loose bodies from the chondromalacia of the patella in both knees. On October 29, 1985, Dr. Alexander performed the arthroscopy and discovered some degenerative chondryl malasia of both knees with loose bodies and synovitis, which were surgically removed. Amburgey was discharged on October 30, 1985, with a prescription for Tylenol for pain and instructions to return in five days for follow up care. (R. 238–244, 294–296).

An audiometric examination performed by Doris P. Walker, a clinical audiologist, on February 14, 1992, revealed Amburgey had a forty percent (40%) hearing loss in the right ear and a sixty percent (60%) loss of hearing in the left ear. (R. 329).

Methodist Hospital's orthopedic surgeon, Dr. David M. Lintner, examined Amburgey on February 23, 1993, for complaints of pain in the knees. Amburgey related that he first injured his knees while carrying paint up stairs for a job he was performing, when he slipped and twisted the knees, subsequently re-injuring the knees in a car accident, baseball game and while riding a stationary bicycle. Amburgey complained of pain in the anterior aspect of the knee aggravated by bent knee activities and catching and popping in the knees. He had a medical history of high cholesterol and arthroscopies performed as late as 1987 on his knees, but no history of cardiac or pulmonary disease. Amburgey had no drug allergies but was taking Advil for pain and Prozac, prescribed by his family physician, Dr. James Carey, for mild depression. An in the lateral and superior portion of the patella and on the medial and lateral articulated margins of the femoral condyles were indicated and it was noted that forced flexion resulted in anterior pain. A large amount of retropatellar crepitation with extremely tight lateral retinaculum was noted. There was a slight variant in the overall alignment and the pivot shift and quadricep tone was normal. X-rays of the knees confirmed the presence of prominent osteophytes at the superior and lateral portion of the patella in the right knee with approximately 50% subluxation and total loss of the lateral joint space of the patellofemoral joint. The left knee showed early osteophyte formation in the patellofemoral joint. Dr. Lintner diagnosed severe degenerative joint disease caused by an extensor mechanism malalignment and chon-

dromalacia patella and recommended that Amburgey have an open extensor mechanism realignment of a modified Elmsie Trillat type and debridement of the osteophytes. Amburgey was told to take Advil for pain. On March 12 and July of 1993, Amburgey underwent arthroscopies and the placement of two screws in the anterior tibia, although he tolerated the procedures well. Post-surgically, his progress was reviewed by Dr. Lintner, noting that he was recovering well, no longer needed braces or crutches and continued to have a whole body disability of ten percent (10%) as a result of his degenerative joint disease. (R. 256–283, 354–357; T. 69). At the request of the Texas Rehabilitation Commission ("TRC"), orthopedic surgeon, Dr. Jerry L. Hyatt, examined Amburgey's left foot on July 22, 1993. Dr. Hyatt noted that Amburgey related that when he was six years old, he slipped under a lawnmower and sustained an amputation of the left forefoot at a level at or distal to the tarsal metatarsal joints. The bases of the fourth and fifth metatarsal remained, the rest of the toes suffering amputation. Dr. Hyatt indicated that the foot is unbalanced when Amburgey walks, resulting in excessive pronation of the longitudinal arch of the foot and remaining forefoot, as well as increased problems with pain in the medial aspect of the left knee probably due to the valgus stress to the knee caused by the pronation. Dr. Hyatt recommended Amburgey be fitted for a foot prosthesis to replace the forefoot and an arch to support the medial aspect of the foot and arch. (R. 255). Ronald J. Massey, Ph.D., a psychologist, administered psychological testing to Amburgey in April of 1993, at the request of the TRC. Dr. Massey noted that Amburgey had no history of mental health treatment or family mental illness. Dr. Massey determined that despite Amburgey's superior intelligence, he had an extremely low self image with no confidence, suicidal or homicidal ideation. Dr. Massey's DSM–VII diagnosis was that Amburgey had an unspecified personality disorder at Axis II, with moderate psychosocial stressors at Axis III and a current global assessment functioning ("GAF") score of 75 (down from 80). (R. 251–253).[4] On April 5, 1993, TRC medical consultant, Dr. D.L. McKellar, determined that Amburgey could perform sedentary jobs, after noting that the claimant had missing toes, an inguinal hernia and a "bad right knee." (R. 248–249).

On October 25, 1994, Amburgey saw clinical psychologist, Walter Y. Quijano, Ph.D., at the request of TRC counselor, Zane Bennett. An examination revealed that Amburgey's affect and mood were depressed, which Amburgey related to his childhood amputation episode and he indicated that he entertained suicidal thoughts but didn't have "the guts" to hurt himself. His history revealed that he was paranoid with depression and he feels that he is walking around with a bull's-eye on his back. Amburgey also believed that he had a bipolar disorder and indicated that he had been treated with Nortiptyline and Prozac, which didn't help. Dr. Quijano diagnosed him as having a severe major depression with some psychotic features and recommended continued individual therapy. Dr. Quijano saw Amburgey again on November 30, 1994, and noted that he had not resumed an anti-depressant therapy because of a mixup with TRC. Amburgey was encouraged to seek anti-depressants from his family physician. On December 22, 1994, Dr. Quijano noted that Amburgey seemed greatly improved with a Zoloft prescription and that the claimant was encouraged to get a stronger

---

4. It is noted that the April 16, 1993 copy of Dr. Massey's Psychological Report, in the administrative record, is an extremely poor duplication and is essentially illegible.

Zoloft prescription and to interact socially. (R. 285–289, 353).

On January 12, 1995, Dr. Quijano noted that Amburgey's family physician, Dr. James Carey, of Oaks Medical Center had prescribed the claimant Zoloft and that after two weeks of taking the medication, Amburgey related he was depressed and had become more socially active, including playing in a San Antonio band and dating. Amburgey indicated he would resume attending school and required assistance from TRC to pay for the Zoloft. Amburgey was seen on November 15, 1995, by Dr. Dalton Heath of TRC for complaints of osteoarthritis in both knees. Following an examination by Dr. Heath, Amburgey was diagnosed with severe osteoarthritis of both knees with severity more in the right than the left. Dr. Heath recommended continued physical therapy and anti-inflammatory medication and possible arthroscopies and debridements in both knees if no improvement and also exempted Amburgey from physical education activities. (R. 284, 290–293, 330).

An audiological assessment was performed December 15, 1996, following complaints of an earache. The assessment revealed that the right ear was borderline normal to a slight loss and the left ear demonstrated a mild conductive loss of hearing due to middle ear fluid, which would present difficulty in understanding if someone was speaking on Amburgey's left side in a noisy listening environment. (R. 298–299, 352).

Dr. Donald Gibson, an internalist, examined Amburgey at the request of the TRC on April 2, 1997. Dr. Gibson indicated that his examination revealed that by age fifty (50), Amburgey will require knee replacement and that his pain registered as 5 on a scale of 1 to 10. Dr. Gibson diagnosed Amburgey as having severe osteoarthritis, with a fairly good range of motion but severe crepitus and pain with ambula-

tion. Dr. Gibson indicated that Amburgey could perform light and sedentary work with brief periods of walking and standing. Climbing would give the claimant the most trouble, although his squat was stable. There was no evidence of medial or lateral instability although the condition was progressive. Dr. Gibson further diagnosed Amburgey as having mild lumbar strain with no evidence of radiculopathy or severe limitation of movement and some hearing loss, although he was found to hear normal office conversation without difficulty. Dr. Gibson determined that Amburgey had no gait disorder as a result of the amputation and wore normal footwear. (R. 300–303). A Residual Physical Functional Capacity Assessment performed by Dr. Randall Scott Rosenberger, a medical consultant for the TRC on May 5, 1997, reflected that Amburgey's back flexion was ninety degrees, overall extension twenty degrees with normal gait, coordination, heel-toe, tandem walk and squat and intact motor and sensory. Dr. Rosenberger also noted that despite severe crepitus of both knees and x-rays revealing severe narrowing of the patellofemoral joint with osteoarthritic changes, both knees were fully flexed at one hundred degrees. Dr. Rosenberger determined that Amburgey could occasionally lift 20 lbs.; stand/walk two hours and sit six hours in an eight hour work day; and that his complaints did not comport with the physician's findings. (R. 305–312). A chest x-ray taken at Columbia Conroe Regional Medical Center and reviewed by radiologist, Dr. Snehal Mehta, on August 17, 1997, following Amburgey's complaints of hypoxemia (low level of oxygen in blood), revealed that the heart was a normal size with normal pulmonary vascularity and generalized evidence of a mild increase in radicular interstitial markings possibly resulting from reactive airway changes or early interstitial edema. (R. 314–319).

Throughout 1998, Amburgey was seen by his family physician, Dr. Carey for impotence related complaints and treatment including the taking of Viagra. (R. 348–351). Amburgey was admitted to Methodist Hospital on February 25, 1998, where Dr. Lintner performed an arthroscopic joint debridement and medial plication of the left and right knee due to extensor mechanism malalignment, chondromalacia and degenerative joint disease of both knees. Dr. Patricia Chevez–Barrios' pathology report revealed that Amburgey had extensive degenerative joint disease. (R. 332–337). On July 23, 1998, in response to Amburgey's complaints of low back pain, Dr. Carl Cannon's examination resulted in a diagnosis of musculoskeletal low back pain with multilevel thoracolumbar degenerative disc disease. Dr. Cannon recommended physical therapy, an MRI of the lumbar spine and prescribed Naprelan for pain and Flexeril for spasm. X-rays of the skull were negative, however, film of the lumbar spine confirmed diffuse thoracolumbar spondylosis and disc space narrowing in the lower lumbar spine. An MRI taken July 28, 1998, revealed degenerative disc disease at T12–L1 with an anterior disc herniation associated with osteophytic ridging and mild to moderate, broad based disc bulge into the spinal canal and a disc bulge with symmetrical component or a protrusion into the left lateral recess and left neural foramen at L4–5. Amburgey returned to Dr. Cannon on September 10, 1998, with worsening complaints of pain after lifting a can of paint the previous week, despite medication and physical therapy. An examination by Dr. Cannon revealed a positive sitting straight leg raise for both lower extremities and satisfactory neurovascular signs. There was pain throughout the lumbar spine and tenderness along the paraspinals and into the sacral area. (R. 339–346). At the recommendation of Dr. Cannon, Dr. Carlos Durham, a surgeon with the Surgery Center of the Woodlands, performed a left L4–5, L5–S1 facet steroid fluoroscopy on September 17, 1998. Dr. Durham's findings were that Amburgey had lumbar facet joint pain syndrome, disc herniation at the L4/5 level, bilateral radiculopathy of the lower extremities and bilateral knee degenerative joint disease for which Dr. Durham recommended that he obtain a prosthesis, continue taking the prescribed medications of Naprosyn, Soma and Vicodin and undergo pain management treatment, including repeated lumbar facet joint steroid injections. (R. 361–369). Psychiatrist, Dr. Larry Flowers examined Amburgey at the request of the TRC on December 21, 1998, and noted that Amburgey complained that he lived three trailers from his parents' trailer and that he eats at his parents' trailer, watches TV and is "just existing." Dr. Flowers' diagnosis was that at Axis I there was a mood disorder secondary to chronic pain. Amburgey's current GAF was recorded at 34 and past year GAF at 40, with a poor prognosis as a result of his physical condition. (R. 322–327).

On January 5, 1999, Dr. Durham indicated that Amburgey was complaining that on a scale of 10 his pain was at a 5 level, and that he continued to take the medications prescribed for pain, Vicodin, Flexeril and Naprosyn. Dr. Durham's examination revealed that Amburgey had some improvement from his facet spinal injection in September of 1998, but continued to suffer pain in his right knee. Dr. Durham's recommendation was that Amburgey undergo a complete right knee replacement. (R. 358–359).

## C. The Procedural Background—The Administrative Proceedings and Exhaustion of Administrative Remedies

Amburgey filed applications with the Social Security Administration on January 1,

1997 and May 13, 1998, seeking disability and supplemental security income benefits, as well as a period of disability through June 30, 1997, due to an inability to work as a consequence of alleged chronic pain, depression and a mood disorder resulting from degenerative joint disease (osteoarthritis) of both knees and childhood partial amputation of the left toes, degenerative disc disease of the lumbar spine and mild conductive loss of hearing in the left ear. (R. 20, 24, 129, 136–138, 178, 182, 184–187, 288, 365–366, 371; T. 36–39, 47–48, 50–51). Following the agency's denial of his claim for benefits, an administrative hearing was held April 19, 1999, at which Amburgey was represented by an attorney. (T. 34–85). The administrative law judge, on May 21, 1999, denied Amburgey's request for benefits after finding that he was not disabled and capable of performing semi-skilled and unskilled sedentary work. (R. 27). Following Amburgey's appeal of the denial of his claim, the Appeals Council affirmed the ALJ's decision on September 13, 2001, thereby, resulting in the ALJ's decision becoming the final decision of the Commissioner. (R. 6–7). Amburgey has, therefore, exhausted all administrative remedies prior to seeking judicial review and, accordingly, the Court has the proper authority, conferred statutorily, with which to commence its review.[5] See *Sims v. Apfel*, 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000); *Weinberger v. Salfi*, 422 U.S. 749, 757, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Jackson v. Apfel*, 234 F.3d 246 (5th Cir.2000); *McQueen v. Apfel*, 168 F.3d 152, 155 (5th Cir.1999); *see also* 42 U.S.C. § 405(g); 42 U.S.C § 1383(c)(3) and 20 C.F.R. § 404.981

and/or 20 C.F.R. § 416 (1999), *as applicable.*

## STANDARDS OF REVIEW

### *The Motion for Summary Judgment*

Summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is, therefore, entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), quoting *Fed.R.Civ.P. 56(c)*; see also *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir.1999); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993). The moving party bears the burden of showing that there is an absence of evidence to support the nonmovant's case. *Id.* A factual dispute is "genuine" when a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also *PYCA Industries, Inc. v. Harrison County Waste Water Management District*, 177 F.3d 351, 361 (5th Cir.1999); *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir.1997). The substantive law dictates which facts are "material." See *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir.), *cert. denied*, 528 U.S. 906, 120 S.Ct. 249, 145 L.Ed.2d 209 (1999); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir.1991). An issue of fact is material if its resolution could affect the outcome of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir.2001). Facts may be gleaned from

---

**5.** This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. section 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act and Rule 72, Fed.R.Civ.P. *See* Order of Referral (Entry # 4). Upon the magis-trate's recommendation, this matter was dismissed on July 8, 2002, for claimant's failure to prosecute his request for judicial review and ultimately reinstated on August 29, 2002. *See* Order of Dismissal (Entry # 7) and Order of Reinstatement of Case (Entry # 9).

reviewing the pleadings, answers to interrogatories, admissions and affidavits on file. See *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir.2000); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). In deciding whether a fact issue has been created, all justifiable inferences must be viewed in the light most favorable to the nonmoving party and questions of law are reviewed *de novo*. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999); *Horton v. City of Houston*, 179 F.3d 188, 191 (5th Cir.1999). If the summary judgment motion is properly supported, however, the burden shifts from the movant to the adverse party, who may not rest on mere allegations or denials, but must set forth specific and supported material facts, of significant probative value, establishing that there exists a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Association of Machinists and Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir.2000); *Union Planters National Leasing, Inc. v. Woods*, 687 F.2d 117, 119 (5th Cir.1982).

### *The Administrative Determination*

■■■ A review of the Commissioner's decision to deny disability benefits compels a determination of whether the substantial evidence in the record, reviewed as a whole, supports the decision, and further, whether proper legal standards were used in evaluating the evidence. *Loza v. Apfel*, 219 F.3d 378, 389 (5th Cir.2000); *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir.2000); *Crowley v. Apfel*, 197 F.3d 194, 197 (5th Cir.1999); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir.1999). "Substantial evidence" means that which is more than a mere *scintilla* but less than a preponder-

ance; and, it is evidence of such relevance that a reasonable mind would accept it as adequate to support the conclusion reached. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir.1995). The elements of proof to be weighed in determining whether substantial evidence exists, include the (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain; (4) claimant's educational background, age and work history. *Owens v. Heckler*, 770 F.2d 1276, 1279 (5th Cir.1985). The Court is not, however, allowed to reweigh the evidence, retry the facts *de novo*, or substitute its judgment for that of the Commissioner. *Id.*; see also *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir.2002). A finding that there is no substantial evidence to support the Commissioner's determination is appropriate only if no credible evidentiary choices or medical findings exist to support the decision, *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Kinash v. Callahan*, 129 F.3d at 738; *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir.1995), thereby, compelling a "[j]udicial review [that is] deferential without being so obsequious as to be meaningless." *Brown v. Apfel*, 192 F.3d at 496; see also *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir.2002).

### *Determining the Existence of an Eligible Disability*

The standard is the same for the judicial review of both social security disability insurance and supplemental income cases. See *42 U.S.C. §§ 405(g)* and *1383(c)(3)*. To qualify for disability insurance benefits, the claimant must meet certain insured status requirements: be under age sixty-five (65), file an application for such benefits, and be under a disability as defined by

the Social Security Act. *42 U.S.C.* §§ *416(i), 423.* Those claiming disability insurance benefits under the Social Security Act have the burden of proving their disability. *Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir.1992); *Demandre v. Califano,* 591 F.2d 1088 (5th Cir.1979).

"Disability" is a legal status that is determined by the ALJ after evaluating expert medical and vocational findings, however, the ALJ's determination must conform to the legal standards established and be supported by substantial evidence. See *Richardson v. Perales,* 402 U.S. at 401, 91 S.Ct. 1420; *Loza v. Apfel,* 219 F.3d at 389. The inquiry necessarily becomes whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ. See *id.* An impairment cannot be assessed as less than severe and accordingly, not disabling, unless it constitutes a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the claimant's ability to work, irrespective of age, education or work experience. See *Stone v. Heckler,* 752 F.2d 1099, 1099 (5th Cir. 1985). It remains, however, the claimant's burden to establish the disability. See *Anthony v. Sullivan,* 954 F.2d at 295; see also *42 U.S.C.* §§ *416, 423.*

To determine the existence of an eligible disability there must, initially, be an evaluation of whether the claimant was unable to perform substantial gainful work existing in the national economy because of a medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted, or which can be expected to last, for a continuous period of not less than twelve (12) consecutive months. 42 U.S.C. §§ 416(1), 423(d)(1)(a), 1614(a)(3)(A); *Barnhart v. Walton,* 535 U.S. 212, 217–18, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002); *McQueen v.*

*Apfel,* 168 F.3d at 154; *Greenspan v. Shalala,* 38 F.3d 232, 236, *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (5th Cir.1994).

A five-step sequential process is utilized by the ALJ to determine whether a claimant qualifies for disability benefits. See *20 C.F.R.* § *404.1520(b)-(f)(1998); Loza v. Apfel,* 219 F.3d at 390; *Leggett v. Chater,* 67 F.3d at 563. The claimant has the burden of establishing the first four steps of the five-step sequential process by establishing a severe impairment which prevents the claimant from performing past relevant work. In this five-step process, the ALJ considers:

1) whether the claimant is currently engaged in substantial gainful activity, as an individual who is working and engaging in substantial gainful activity will not be found disabled, regardless of the medical findings;

2) whether the claimant has a severe impairment;

3) whether the claimant meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, as such an individual will be considered disabled without consideration of vocational factors;

4) if an individual is capable of performing the work they did in the past, a finding of not disabled must be made; and,

5) if an individual's impairment precludes them from performing their past work, other factors, including age, education, past work experience and residual functional capacity must be considered to determine if there is any work in the national economy that the individual can perform.

*20 C.F.R.* § *404.1520(b)-(f);* see also, *Carey v. Apfel,* 230 F.3d 131, 134–5 (5th Cir.2000); *Brown v. Apfel,* 192

F.3d at 498; *Leggett v. Chater,* 67 F.3d at 566.

The Commissioner bears the burden as to the fifth step of the process. See *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001). If the Commissioner meets this burden, the claimant must then prove that he or she cannot, in fact, perform the alternate work suggested. See *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir.2002); *Carey v. Apfel,* 230 F.3d at 135. If, at any step of the analyses, the ALJ finds that the claimant is or is not disabled, the inquiry is terminated. *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Myers v. Apfel,* 238 F.3d at 619.

## DISCUSSION

***The ALJ Properly Relied Upon the Medical Expert's Testimony when Rejecting the Opinion of an Examining Psychiatrist that Failed to Comport with the Significant Medical Evidence***

There is no dispute that Amburgey did not engage in substantial gainful activity during the relevant period in question, thereby, meeting the first step of the sequential process. (R. 26). The ALJ further determined at the second step, that Amburgey's ailments constituted severe impairments, however, neither of his impairments met or equaled a listed impairment at step three of the sequential process. (R. 21). The ALJ found, at the fifth step of the evaluation process, that although Amburgey's impairments were severe, preventing him from performing his past relevant work, the impairments were not severe enough, either individually or in combination with the other, to constitute a disability. (R. 19–26).

Amburgey appears to have no dispute with the ALJ's determination that Amburgey's physical impairments failed to constitute a disability. *See* Plaintiff's Motion for Summary Judgment (Entry # 20). Am-

burgey maintains, however, that the ALJ, in considering the severity of his mental impairment, improperly rejected the opinion of his alleged "treating" psychiatrist, Dr. Flowers, by relying upon the testimony of the medical expert, whose testimony, Amburgey claims was improperly induced by the ALJ. See *id.*

■ An ALJ has the duty to develop the facts fully and fairly when deliberating a claim for social security benefits; and, if the ALJ does not satisfy his duty, his decision is not substantially justified. *Newton v. Apfel,* 209 F.3d 448, 458 (5th Cir.2000), quoting *Ripley v. Chater,* 67 F.3d at 557; *Carey v. Apfel,* 230 F.3d at 142. The Commissioner, naturally contends that the ALJ's findings comported with the facts and the law and asserts that Amburgey's claims are unfounded. *See* Defendant's Motion for Summary Judgment (Entry # 21).

### A. The ALJ's Rejection of an Examining Psychiatrist's Opinion Was Proper

During the administrative hearing, two medical experts were called to testify. Dr. Richard DeYoung, an orthopedic surgeon, testified that although Amburgey's physical impairments were severe, they failed to meet the requirements set forth by sections 1.03, 1.05 or 1.05C of the Listing of Impairments and that Amburgey is capable of performing sedentary work. (T. 59–63). Amburgey does not dispute the testimony of Dr. DeYoung. *See* Plaintiff's Motion for Summary Judgment (Entry # 20). Dr. H. James Stuart, a psychiatrist, testified that Amburgey's mental impairments were severe, but failed to meet section 12.04 of the Listings. (T.66–68). Amburgey claims that the ALJ improperly rejected the findings of his treating psychiatrist, Dr. Flowers, by improperly leading Dr. Stuart's testimony and then relying upon

Dr. Stuart's recommendation to disregard Dr. Flowers' findings. *See* Plaintiff's Motion for Summary Judgment (Entry # 20).

It is clear that the ALJ relied upon the medical expert's testimony in rejecting the findings of Dr. Flowers. (R. 23). The ALJ makes a pointed reference in his findings to Dr. Stuart's testimony that Dr. Flowers' determination that Amburgey had no ability to function independently was contradicted by Amburgey's testimony and that Dr. Flowers' assessment that Amburgey had difficulty in dealing with the public was not supported by the record. *Id.* These factors supported the ALJ's rejection of Dr. Flowers' findings. Additionally, the ALJ indicates the motivation to reject Dr. Flowers' findings was prompted by a finding that the psychiatrist "... does not cite any evidence nor offer any reasons to support his assessment" that the claimant has no ability to function independently and a poor ability to relate to coworkers, deal with the public, deal with work stress, maintain attention/concentration, relate predictably in social situations, and understand, remember, and carry out simple, detailed, and complex job instructions. (R. 23). The ALJ's assessment comports with the testifying medical expert's assertion that Dr. Flowers' medical findings did not "jive" with the record in totality. (T. 76).

A review of Dr. Flowers' narrative does indicate that his findings were based on the physician's assessment of the medical records, including Amburgey's prior psychiatric and psychological assessments. (R. 322–323). Further, Dr. Flowers' findings comported with Amburgey's long-term medical assessment for mental illness as the records indicate that he was treated by a family physician for mild depression as early as 1993. Dr. Massey, after administering psychological tests, determined that Amburgey had an unspecified personality disorder with moderate psychosocial stressors. (R. 251–253). The following year, the determination of Dr. Quijano, a TRC consulting examining clinical psychologist, was that Amburgey had a severe major depression with some psychotic features. (R. 285–289, 353).

Dr. Flowers' diagnoses, however, was completely at odds with the findings of Drs. Carey, Massey and Quijano, with respect to the claimant's treatment and prognosis for mental illness. Neither Drs. Carey, Massey or Quijano determined, as did Dr. Flowers, that Amburgey had a poor prognosis. (R. 251–253; 285–293, 353). Further, both Drs. Carey and Quijano prescribed Zoloft for the treatment of Amburgey's mental illness and noted a marked improvement in his condition with the medication. (R. 284, 290–293, 330). Until Dr. Flower's assessment in December of 1998, the medical records do not reveal that Amburgey had any mental deterioration, decompensation or treatment of his mental condition or any change in the medication prescribed to treat the alleged mental impairment. (R. 251–321).

It appears that Drs. Massey, Quijano and Dr. Flowers each examined Amburgey, solely as an effort to provide their opinions of the claimant's mental condition to the TRC. The record provides no indication that Dr. Flowers saw Amburgey as a private patient or beyond the time indicated in the physician's December, 1998 narrative report to the agency. (R. 322–327). The record does reveal, however, that Dr. Carey was a treating physician of the claimant. (R. 284, 290–293, 330). Further, although it appears that Amburgey was seen by Dr. Quijano, a consulting psychologist for the TRC, the record is equally clear that the physician saw and treated Amburgey over a period of time. (R. 285–289, 353).

■ Generally, the ALJ would ascribe the opinion of a treating physician, considerable weight, when assessing a disability

determination. See *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir.2001); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir.1994). In this instance, however, where Dr. Flowers does not appear to be the claimant's treating physician, the weight accorded his findings is within the ALJ's discretion. See *Chambliss v. Massanari*, 269 F.3d 520, 523 fn. 1 (5th Cir.2001). Where as here, the ALJ had the benefit of an examining psychiatrist's findings as to Amburgey's mental condition, the ALJ properly admitted, reviewed and considered the medical conclusions of Dr. Flowers. See *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir.2000). The ALJ properly rejected those findings, however, where it appeared they did not comport with the substantial medical evidence, including the opinions of the treating physicians and the testifying medical expert. See *Myers v. Apfel*, 238 F.3d at 621; *Leggett v. Chater*, 67 F.3d at 566. Dr. Flowers' opinion as to Amburgey's prognosis did not comport with the medical records or the findings of Dr. Carey or Dr. Quijano, as their assessment was that the claimant's mental impairment was greatly improved with medication, and the medical evidence appears to sustain Drs. Carey and Quijano's findings, as there was no report of Amburgey having recurrent mental difficulties until his examination by Dr. Flowers. Further, no other mental health expert determined that Amburgey's mental impairment would prevent him from performing some work and in fact, Dr. Massey's determination was that the claimant could perform sedentary work. (R. 251–253). Although, Drs. Massey and Quijano are psychologists and not the psychiatrist that Dr. Flowers is, their findings as to Amburgey's mental condition is supported by the conclusions of Dr. Carey, Amburgey's longtime treating physician; Dr. Stuart, the testifying psychiatrist; and, the medical evidence reflects that Amburgey's mental impairment, though severe, was successfully treated and maintained with medication. (T. 65–68). Conversely, the record provides no support for Dr. Flowers' prognosis and Dr. Flowers also failed to provide an explanation as to why, despite the medical records' indication that Amburgey's mental condition was maintained solely with medication for years and that the claimant required no hospitalization for mental instability, Amburgey evinced such a deterioration of his mental condition as to warrant the poor prognosis rendered by Dr. Flowers. In this instance, the ALJ properly rejected the conclusions of Dr. Flowers, as his psychiatric findings were unsupported by the evidence, thus, providing the good cause necessary to reject such findings irregardless of whether they are provided by a treating or consulting physician. See *Myers v. Apfel*, 238 F.3d at 621.

■ Amburgey further failed to establish that his mental condition, though severe, was disabling, as the significant evidence established that his condition was reasonably maintained by medication. (R. 284, 290–293, 330). Those medical conditions that can be reasonably remedied by either surgery, treatment or medication cannot support a finding of disability. See *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir.2002); *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir.1988). In the instant case, the medical record reveals that Amburgey's mental impairment was controlled by medication to the extent that he was able to perform sedentary work when examined by Dr. Quijano, and the claimant testified he was capable of performing some household chores and had some social interaction, including occasionally going to movies and clubs. (R. 24, 251–253; T. 52–53).

■ The ALJ's finding that Amburgey's mental condition, although severe, was not

disabling either by itself or in combination with his other impairments, was proper where as here any indication to the contrary was refuted by the significant medical evidence and his condition was improved with medication.

## B. The ALJ's Reliance Upon and Examination of the Testifying Psychiatrist Was Proper

Amburgey's claim that the ALJ improperly induced the testimony of the psychiatric medical expert, Dr. Stuart, by leading the witness' testimony, must be equally dispatched. Amburgey objects to the following exchange between the ALJ and the medical expert, Dr. Stuart, which took place during the administrative hearing:

ALJ: Now you've read that narrative report, right?

ME: I did.

ALJ: Which is pretty much a lot of subjective things and some mental status examination.

ME: Yes.

See Transcript of administrative hearing at p. 76.

The claimant objects to the ALJ's inference of Dr. Flowers' narrative report as premised on merely "subjective" criteria and describes the ALJ's examination of the medical expert to elicit his concurrence as to the subjectivity of the data supporting the report, as leading the witness. See Plaintiff's Motion for Summary Judgment (Entry # 20).

■ Amburgey correctly characterizes the proper role for the ALJ as that of a "non-advocate." The Supreme Court has made clear that there is a difference between administrative agencies and courts and that the difference is wide. Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), quoting Shepard v. NLRB, 459 U.S. 344, 351, 103 S.Ct. 665, 74 L.Ed.2d 523 (1983). In disavowing the notion that administrative bodies and

courts ought to be regarded as the same, the Court cautioned once again, "... we have, thus, warned against reflexively assimilating the relation of ... administrative bodies and the courts to the relationship between lower and upper courts." Id., quoting FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 144, 60 S.Ct. 437, 84 L.Ed. 656 (1940). The Sims decision explains that the courts are structured on an adjudicative model involving decision making, however, the SSA is an agency that was designed to effect the policies of an "investigatory model" and, hence, its proceedings are inquisitorial rather than adversarial. See Sims v. Apfel, id. As a consequence, "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Id., citing Richardson v. Perales, 402 U.S. 389, 400–401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (emphasis added). The administrative review process conducted by the SSA is, therefore, to be conducted in an informal, non-adversarial manner. Id.; see also 20 CFR § 404.900(b)(1999).

In recognizing the Supreme Court's admonition that the SSA's administrative review process is to be construed as a non-adversarial process, it would be disingenuous to hold the agency's investigatory mandate to the stricter and more formal dictates of those evidentiary rules relied upon in adjudicating cases by judiciary bodies. Further, in this instance it is clear that the ALJ's query, though inferring that Dr. Flowers' findings are based upon subjective data, also acknowledged that the psychiatrists' conclusions were premised upon some "objective" criteria, i.e., the mental status examination. (T. 76).

■ Finally, Amburgey's objection to the ALJ's inference that Dr. Flowers' conclusions included subjective matters must not be sustained, as counsel ably cured any

harm incurred by the ALJ's examination, when Amburgey's attorney elicited the testifying medical expert's acquiescence that any psychiatric examination is always based upon the subjective complaints and views of the patient. (T. 77). The exchange between counsel and the medical expert affirms the necessity for an examining psychiatrist's reliance upon the patient's subjective observations:

ATTY: But you, but all of your interpretations. I mean, things that you ask the person. Isn't that based on subjective opinions and testimony from a person when you're asking them questions?

ME: Well, I think everything has to be taken in that, but it's, you know, what you do is you take what they tell you in light of in terms of your own training and experience.

*See* Transcript of the administrative hearing at p. 77.

It is clear, therefore, that any harm caused by the ALJ's examination of the medical expert was subsequently reformed during the cross-examination of the witness. Consequently, it is recommended that the ALJ's questioning of the medical expert be deemed proper as its scope and manner was consistent with that allowed informal, non-adversarial inquisitorial processes, and any harm incurred was remedied during the cross-examination of the witness.

In this instance, it is clear that the ALJ fully developed the record in finding that Amburgey was not disabled when the ALJ properly relied upon the testimony of the testifying psychiatrist when rejecting the testimony of the examining psychiatrist, Dr. Flowers, where it failed to comport with the significant medical evidence.

## CONCLUSION

Following a review of the entire record, it is recommended that the ALJ's decision be affirmed as the findings comport with applicable legal standards and the substantial evidence and, accordingly, there has been presented in this matter, no genuine issue necessitating the reversal of the Commissioner's decision. It is, therefore,

**RECOMMENDED** that Amburgey's Motion for Summary Judgment (Entry # 20) be **DENIED**. Further, it is

**RECOMMENDED** that the Commissioner's Motion for Summary Judgment (Entry # 21) be **GRANTED**. Finally, it is

**RECOMMENDED** that Final Judgment be entered in favor of the Commissioner and that this matter be **DISMISSED with prejudice** from the Court's docket.

The Clerk shall file this Memorandum and Recommendations and provide the parties a true copy. The failure to file written objections to the proposed findings and recommendations within ten (10) days of the entry of this Memorandum and Recommendations, may bar an aggrieved party, except upon grounds of plain error, from attacking the proposed factual findings and legal conclusions, on appeal. See *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Acuna v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir.2000); *Douglass v. United Services Automobile Assoc.,* 79 F.3d 1415, 1428–29 (5th Cir.1996) (*en banc*); see also 28 U.S.C. § 636(b)(1)(C).